1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ALABAMA
2                          SOUTHERN DIVISION

3

4    KAYLAN MORRIS,                2:19-cv-650-GMB
     on behalf of herself and all
5    others similarly situated,   January 12, 2022

6                    Plaintiff,    Birmingham, Alabama

7    VS.                          9:00 a.m.

8    WALMART, INC., formerly
     known as Wal-Mart Stores, Inc.,
9
                     Defendant.
10
     * * * * * * * * * * * * * * * * * * * * * * * *
11

12            REPORTER'S OFFICIAL TRANSCRIPT OF
                    EVIDENTIARY HEARING
13

14

15         BEFORE THE HONORABLE GRAY BORDEN
        UNITED STATES DISTRICT MAGISTRATE JUDGE
16

17

18

19

20

21

22

23   Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
     and Procedures Vol. VI, Chapter III, D.2. Transcript
24   produced by computerized stenotype.

25

1                          * * * * *
                    A P P E A R A N C E S
2                          * * * * *

3     FOR THE PLAINTIFFS:

4     Taylor Bartlett
      W. Lewis Garrison, Jr.
5     Christopher B. Hood
      Heninger Garrison Davis
6     2224 1st Avenue North
      Birmingham, Alabama  35203
7     205.326.3336

8

9     FOR THE DEFENDANT:

10    Cole Robinson Gresham
      Michael Lasserre
11    Starnes Davis Florie
      100 Brookwood Place, 7th Floor
12    Birmingham, Alabama  35209

13

14    Also Present:

15    Courtroom Deputy:  Angela Langley

16    Court Reporter:  Teresa Roberson

17

18

19

20

21

22

23

24

25

1                            I N D E X

2      WITNESS SARAH BUTLER

3      DIRECT BY MR. GRESHAM.......................59
       VOIR DIRE BY MR. BARTLETT..................66
4      DIRECT BY MR. GRESHAM.......................68
       CROSS BY MR. BARTLETT......................80

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    * * * * *
                P R O C E E D I N G S
2                    * * * * *

3          THE COURT:  Good morning.  Let's go on the record

4  in 19-cv-650, Morris versus Walmart.  As you're all aware,

5  we're here for an evidentiary hearing on class cert today.

6          Couple of housekeeping issues as we get started.

7  I understand Walmart is presenting testimony by zoom from

8  Sarah Butler.  Is that your only live witness today?

9          MR. GRESHAM:  Yes, Your Honor, it is.

10         THE COURT:  And then who can we expect from you

11 today?

12         MR. BARTLETT:  We'll cross-examine Ms. Butler, but

13 no other live witnesses.

14         THE COURT:  Thank you.  I just wanted to make sure

15 we're all on the same page.

16         Number two, obviously I've not made a decision on

17 class certification, but -- and I don't want you to read

18 anything into this, but I do need to see a proposed order on

19 class cert from you maybe in the next fourteen days.

20         Then, are either of you, maybe this is something

21 we can just put a pin on in the end and come back to, but is

22 anybody anticipating needing supplemental briefing after

23 this hearing?

24         MR. HOOD:  Your Honor, Chris Hood for the

25 plaintiff.  It would, I think, depend on what we hear from

1    the defense today.

2             THE COURT:  Okay.

3             MR. GRESHAM:  That's fine, Your Honor.

4             THE COURT:  Why don't we circle back to that.  I

5    just want to make sure that we request the transcript if we

6    are going to need it, just so we can make sure that is done

7    today.

8             Anything else before we get started?

9             MR. GRESHAM:  Your Honor, on the proposed order on

10   class certification, did you want both parties or just from

11   the plaintiff on that?

12            THE COURT:  Well, I guess you probably do want to

13   have some input on that, so, yeah, why don't you exchange it

14   with them and see if you can do a joint proposed class cert.

15   Understanding, of course, that you would propose it not be

16   certified.

17            MR. GRESHAM:  Sure.

18            THE COURT:  All right.  Then the only other thing

19   I wanted to ask you to do, just because we have a couple of

20   new lawyers who have appeared in the last couple of days, if

21   you guys will do appearances for the record for my benefit

22   and for the benefit of the court reporter.

23            MR. BARTLETT:  Good morning.  Taylor Bartlett for

24   the plaintiff.

25            MR. GARRISON:  Lou Garrison for the plaintiff.

1          MR. HOOD:  Chris Hood for the plaintiff.

2          MR. GRESHAM:  Cole Gresham for WalMart.

3          MR. LASSERRE:  Michael Lasserre for WalMart.

4          THE COURT:  Thank you.  You can call your first

5    witness.

6          MR. BARTLETT:  Your Honor --

7          THE COURT:  That's right, I forgot.  You're not

8    presenting live witnesses.  Why don't you just start with

9    your argument.

10         MR. BARTLETT:  If I may approach.  What I have

11   done is, as Your Honor is aware, we have exchanged

12   deposition designations, a set of plaintiff's affirmative

13   depositions, so we have kind of copied and pasted them into

14   a document for you to reference.

15         THE COURT:  Sure.

16         MR. BARTLETT:  If I may hand these to you.  I have

17   already given them to WalMart as well.

18         THE COURT:  Let me state for everybody, feel free

19   to take your mask off when you're speaking or any other time

20   that you are all comfortable with.

21         MR. BARTLETT:  Your Honor, since there were no

22   objections from WalMart with respect to the plaintiff's

23   affirmative designations, we move that those be entered into

24   the record.

25         THE COURT:  No objection?

1          MR. GRESHAM:  No objection, Your Honor.

2          THE COURT:  These are admitted.

3          MR. BARTLETT:  Thank you.  We may reference

4    certain testimony, but pursuant to our call before this

5    hearing, I don't intend to just read them into the record,

6    and we'll try our best to streamline this by not spending

7    too much time addressing this testimony that we're all able

8    to read.

9          As Your Honor's aware, this case has been going on

10   for quite some time.  It concerns two claims on a pediatric

11   shake.  The first is that it is naturally flavored and

12   that's with respect to the vanilla shake.

13         The second is that both the vanilla and the

14   chocolate shake contain no synthetic color, flavor, or

15   sweeteners.

16         The plaintiff claims that these are false and

17   deceptive.  And that in addition to being false and

18   deceptive, they are a breach of the warranty, both express

19   and implied.

20         We have a few claims here that we're seeking

21   certification on.  First is the Alabama Deceptive Trade

22   Practices Act.  The second is express warranty.  The third

23   is implied warranty.  Along with those comes the federal

24   claim of the Magnuson-Moss Warranty Act.

25         We are not seeking a certification of the unjust

1   enrichment claim.

2   And to be clear, there is no personal injury claim

3   here being asserted by -- whether individually or from a

4   class perspective.

5   The class definition that the plaintiff moved on

6   is all persons in Alabama who purchased a clean label

7   chocolate or vanilla shake after February 1 of 2018.  Let me

8   just stop here and explain.  Clean label is a term from

9   Walmart's depositions.  That means those shakes that contain

10  the two claims here made by Morris -- naturally flavored, no

11  synthetic color, flavor or sweeteners.

12  Before approximately February of 2018, there was,

13  for lack of a better term, an unclean label shake.  It did

14  not have these claims in it, this case does not involve

15  those, those are separate issues, and we're not making any

16  claim against those.

17  From an organizational standpoint, if Your Honor

18  is okay with that, I would like to address a few points

19  under Rule 23 that are not controverted here, just to get

20  those off the table.

21  First, numerosity.  Walmart doesn't claim that we

22  haven't met the numerosity element of Rule 23.  Walmart also

23  doesn't claim that the label, the packaging and the

24  advertising are all the same regardless of the location or

25  the time that a shake was sold in Alabama.

1          Ingredients.  During this class period the

2     ingredients of the chocolate and vanilla shake are the same,

3     regardless of location or time.

4          They also don't challenge the adequacy of counsel.

5          With respect to ascertainability, there is some

6     challenge from Walmart; however, in its response, it admits

7     that at least those purchasers of about fifty-two thousand

8     four hundred shakes are ascertainable.  We'll get into that

9     in a little more detail.

10          And the reason they're ascertainable is Walmart

11     maintains records, they have data on these purchases,

12     they're able to determine who purchased what based upon

13     Walmart pay accounts or Walmart.com accounts.

14          They also don't challenge the Rule 23(b) element

15     of superiority here.

16          Finally, with respect to adequacy, Walmart doesn't

17     challenge that the plaintiff will and has adequately

18     prosecuted the action, which is just one element of the

19     adequacy requirement.

20          What we plan to show the court here is that

21     questions of law in fact are common, the claims are typical

22     and adequate.  And we'll address the typicality and adequacy

23     requirements together which is how Walmart did.

24          Plaintiff has standing.  We'll address under the

25     standing issue both injury and notice under the warranty in

1    the ADTPA claims.

2            We'll address predominance which is under Rule

3    23(b)(3).  We'll show the court that there are common

4    questions and they do predominate.  We will do it under each

5    of the claims we assert here.

6            Damages.  We'll talk about damages.  We'll show

7    that liability here is determinable on a class-wide basis.

8    We know the purchaser of each shake, we know the price of

9    each shake, we know where they bought each shake, whether

10   it's in Alabama or elsewhere, so we can figure out who

11   purchased and who is part of this class.

12           We also know Walmart's cost of these shakes.

13   That's an important element here that we'll talk about

14   shortly.

15           Under the predominance argument, we expect Walmart

16   to bring an expert, Ms. Butler.  We'll probably wait, if

17   it's okay with Your Honor, to address that on cross-

18   examination and on our rebuttal because at this point that

19   testimony is not in the record.

20           We'll talk about ascertainability.  And we'll talk

21   about the Cherry case, the recent 2021 Eleventh Circuit

22   case.  That Cherry case is controlling law.  Walmart didn't

23   raise it in their response.  They didn't even address

24   plaintiff's citation to Cherry.  They used an old standard.

25           Finally, we'll talk about injunctive and

declaratory relief, both outside of the class context and

under 23(b)(2).

Mr. Hood, if it's okay with Your Honor, will take

up the 23(b)(2) and the injunctive declaratory relief toward

the end of my argument.  He'll also address notice under

warranty and the ADTPA claim.

Before I jump in to each of these things, is there

anything you would like me to focus on?  Would you like me

just to kind of go through each of the things I talked

about?

THE COURT:  I mean, I don't want to control your

presentation, and I think you're right to be focused on

predominance.

Beyond that, I'll hear anything you want to tell

me.

MR. BARTLETT:  Just kind of in order of the brief

and in order of the response, I think I would like to just

start with commonality.

The law in the Eleventh Circuit under Carriuolo

versus General Motors is that there must be a single common

question to satisfy the commonality requirement.  It merely

requires a showing that there is some glue that holds those

claims together.  That's from the Walmart versus Dukes case,

U.S. Supreme Court.

In our motion, we list half a dozen common

questions at Page 11.  I won't go over each of those.  But I will point out that in Walmart's opposition at Page 23, and I am referring to the bottom number of the page numbers when I do things because the ECF number with the public filed document is off of the page number, the actual unredacted version.

Walmart admits, with respect to commonality, there is at least one common question and that's whether the claims challenged here are deceptive.  That's sufficient to meet that element under controlling Eleventh Circuit law.

Move on to typicality and adequacy.  Typicality refers to the class representatives' claims in relation to the claims of the class.  That's from a 2001 Eleventh Circuit case Piazza v. EBSCO.  And each of these cases I refer to, Your Honor, were cited in the brief.  So if you need any further clarification, I can certainly do that.

The only difference here between Morris and the putative class she seeks to represent is the amount and not the type of damages she claims.

She's adequate as well because under the Eleventh Circuit controlling law, the inquiry is whether the plaintiffs have interests that are antagonistic to those of the class.  That's the Griffin v. Carlin case from 1985, Eleventh Circuit.

Like other members of the classes here, Ms. Morris

1    was damaged for three reasons.  First, she purchased these

2    shakes, she should be entitled to a refund because they

3    weren't what they said they were.

4         Number two, she paid a premium above and beyond

5    the market price of the pediatric shakes.  Walmart tries to

6    change the plaintiff's claims here with respect to the

7    premium of the price paid.  Walmart tries to say she didn't

8    pay a premium because the unclean label shakes, that she

9    purchased, admittedly, were the same price as the premium --

10   as the clean label shakes that she purchased.  That's not

11   the analysis here.

12        Walmart doesn't cite any law for that.  It's a

13   creative argument, but it's not the law.  The law is is the

14   price paid for the clean label shakes above the market price

15   if the deceptive and unfair labeling was not on that.

16        So you have got to look to the market price.  We

17   will talk a little bit more about that in a minute.

18        She is also entitled to statutory damages under

19   the ADTPA.  Walmart makes an argument that she's

20   not entitled -- the only argument that Walmart makes with

21   respect to the statutory damages is that because she doesn't

22   have other damages, premium damages and refund damages,

23   she's not entitled to damages under ADTPA.

24        Well, we just showed Your Honor that she paid a

25   premium, she's entitled to a refund.  We'll talk a little

bit more about that in a minute.  But the ADTPA claim also

provides for damages here.  So she's got three categories of

damages.  Each of the class members also has three

categories of damages.

         To talk about standing which is one of the

elements or one of the main oppositions from Walmart, they

raise a standing issue with Ms. Morris on two things:

Injury and notice.  Mr. Hood is going to talk about notice,

I will talk about injury right now.

         Injury under the Eleventh Circuit law, there is an

economic injury and it qualifies as a concrete injury for

purposes of standing, and I quote, "if a person experiences

an economic injury when, as a result of a deceptive act or

an unfair practice, he is deprived of the benefit of his

bargain".  That is from the Debernardis case, Eleventh

Circuit, 2019.  Exactly what we're arguing here.  We're

arguing that Ms. Morris paid for the shake, she intended the

shake to have the two claims that we assert here --

naturally flavored and no synthetic color, flavor or

sweeteners -- she asserts that the label is misleading and

deceptive.  She has been economically injured.  She has

standing.

         Talk about the refund.  So, what law permits

Ms. Morris to seek a refund here.  Well, Ms. Morris alleges,

both in her operative complaint, second amended complaint,

at Document 42, Paragraphs 97, 120, 133, and 144 that she
would not have bought these shakes had she known their
contents did not match the labeling.

    She also says this in her deposition, Pages 37,
Line 20 through 38, Line 9.  A plaintiff can suffer an
injury-in-fact simply because they purchase a product as a
result of a deceptive act or an unfair practice that they
would not have purchased otherwise.  That is that
Debernardis case.  Same law, same controlling law here.

    We also have a case, Reynolds v. Walmart Stores
from the Northern District of Florida in 2015, and I quote,
"a plaintiff can meet the injury-in-fact requirement with a
showing that by relying on a misrepresentation on a product
label they paid more for a product than they would otherwise
have paid or bought it when they otherwise would not have
done so".

    That's the claim Ms. Morris makes, that's the law,
she is entitled to a refund.

    In Walmart's response, and we address this in
detail in our reply, Walmart cites Doss v. General Mills for
the support that Ms. Morris didn't suffer an injury.

    Well, that is an Eleventh Circuit case, it is from
2020, and it would be controlling on this court except it's
inapposite.  That ruling, that opinion, is premised upon the
plaintiff's alleged failure -- I'm sorry -- the defendant's

1    alleged failure to disclose that the Cheerios products

2    contained glyphosate.

3           In Doss, the Doss plaintiff there, Walmart fails

4    to tell this court that the Eleventh Circuit affirmed

5    dismissal of that complaint because the plaintiff in Doss,

6    and I quote, "had not alleged that she purchased any boxes

7    of Cheerios that contained any glyphosate".  That is not the

8    issue here.

9           The second category of injury for Ms. Morris is

10   premium.  She paid a premium.  It's the benefit of the

11   bargain damages.  Under the Eleventh Circuit Debernardis

12   case, that's calculated based upon the difference in the

13   market value of the product or service in the condition in

14   which it was delivered, and its market value in the

15   condition in which it should have been delivered according

16   to the contract of the parties.

17          So, basically, what I talked about earlier, you

18   have got Ms. Morris buys the clean label shake, she thinks

19   it's naturally flavored, she thinks there is no synthetic

20   color, flavor or sweeteners in it, she pays a price for it,

21   whatever it is, a little over eight dollars for a pack of

22   six.  The market value of that is less because these claims,

23   according to Ms. Morris, are deceptive and they are not

24   true.

25          So we've got to look at the market value.  What

1   that market value is, we don't know yet.  We haven't gotten

2   to that stage.  That's a merits question.

3        We cite law, and I think I have it here, we cite

4   law in our brief that says whether Morris paid a premium

5   would, and I quote, this is from a case, to be clear, this

6   is a Northern District of California case from 2014, it's

7   not controlling on this court, but it's persuasive.  It

8   says, "that issue as to whether there was a premium paid

9   should be more properly addressed in the context of a

10  dispositive motion rather than a motion to dismiss or a

11  motion for class certification" and that makes sense because

12  we haven't done market research to determine what the value

13  of this product would be, the market value absent these

14  claims.  We don't have that information yet.  We focused on

15  class certification, not merits discovery.

16       Walmart's corporate -- we deposed three corporate

17  representatives.  One of them was Ms. Redford.  She

18  testified that Walmart developed the clean label shakes to

19  compete with brand named products like Pediasure.  Redford's

20  deposition Page 163.

21       Back then, when Walmart developed the clean label

22  shake, the Pediasure shakes didn't have a clean label.  They

23  were still in the old school, they were still in the

24  unclean.  So Walmart says, hey, we want to compete with

25  Pediasure, place this private brand right next to Pediasure

1   on the shelves, and we want to get an advantage, we want a

2   market advantage over Pediasure.

3           Walmart did that because they thought they could

4   get a premium.  If --

5           MR. GRESHAM:  Objection, Your Honor, he is

6   implying that that's the testimony.  That is not the

7   testimony in the record.  I think the testimony speaks for

8   itself.  I just want to point out that that is not the

9   testimony of Walmart or its corporate rep.

10          THE COURT:  Are you referring to a specific

11  portion of the corporate representative deposition?

12          MR. BARTLETT:  I certainly didn't mean to

13  insinuate that Walmart testified that it was intending to --

14  I will point out the actual page.  I think I'm on Page 163,

15  which would be bottom of Page -- would be 19 in this little

16  paper I gave to Your Honor.

17          THE COURT:  Redford's testimony?

18          MR. BARTLETT:  Yes, sir.  The question is, kind of

19  starts about a third of the way down.

20          Okay.  Do you know why the decision was made to

21  move away from these artificial flavors, colors and

22  sweeteners?

23          Answer:  It creates distinctiveness in our private

24  brands.  The customer has an option to select either the

25  Pediasure product that contains, at the time, artificial

sweeteners and flavor and colors or they can purchase

Parent's Choice.

      Question:  So the lack of artificial colors,

flavors, or sweeteners would give Walmart a competitive

advantage over Pediasure?

      Answer:  I wouldn't characterize it as a

competitive advantage.  It provides a differentiation and an

opportunity for the customer to select something different.

      And it talks about value.

      I think what I said, and I'm looking here at my

outline, Walmart's corporate representative testified that

it developed the clean label shakes to compete with brand

name products like Pediasure.  And I cited this page.  So I

don't think I misrepresented that.

      I think what Walmart, the objection here, is

that -- my argument is that Walmart was creating this clean

label shake to get an advantage on product and pricing in

the market.  I think that's a natural argument from this

testimony.  I mean, Ms. Redford goes on to say, we did this

to give customers a choice.

      And then final question there on Page 19 for

Ms. Redford, on Page 163, "but it did differentiate it",

meaning the clean label shakes, "from Pediasure"?

      And she said "yes."

      So, in addition to the reason behind the clean

1    label change, which was developed in late 2017, is that it

2    wanted to compete in this marketplace.  It wanted a clean

3    label shake and it thought it could get that.

4         The problem here is that it's not -- it's not

5    clean label, it's deceptive.  We have got to figure out what

6    that market price is to determine whether there was a

7    premium paid.  The bottom line is that is not something we

8    determine at this stage.

9         Again, to wrap this up under the ADTPA.  Because

10   Morris suffered an injury-in-fact under both the refund

11   injury theory and the premium paid theory, she's entitled to

12   damages.

13        As I mentioned, the other standing issue is

14   notice.  And my colleague Mr. Hood is going to address that

15   towards the end, if that's all right with you.

16        THE COURT:  Let me interrupt.  Maybe this is a

17   good time, maybe it's not, but this is where this note is in

18   my outline.

19        You had discussed in your briefs the potential of

20   substituting a class rep if there became an issue with

21   Ms. Morris.  And I'm just curious what you're contemplating

22   as far as the mechanics of that -- timing, additional

23   discovery needed, that sort of thing.

24        MR. BARTLETT:  So, timing, I think we could

25   certainly substitute within thirty days.  We think, and I

1    may defer this question or ask Mr. Hood to help me out here,

2    but I think that the only substitution that we envision

3    would be for someone to bring a warranty claim, express and

4    implied, and Magnuson-Moss Warranty.

5         We believe that Ms. Morris is adequate, has

6    standing for the injunction and also the ADTPA claim.

7         In terms of discovery, I'm certainly happy to put

8    up a deposition, put this person up for deposition and any

9    written discovery needed, we could even do it on an advanced

10   timeline.

11        THE COURT:  All right.  Just wanted to know.

12        MR. BARTLETT:  Sure.  And if you need me to

13   address the law on that, I think we certainly can, it's in

14   our briefing.

15        The next topic that I would like to address is

16   predominance.  Common issues of fact and law predominate if

17   they have a direct impact on every class members' effort to

18   establish liability and on every class member's entitlement

19   to injunctive and monetary relief.  That's from the Clay

20   case.  We are all familiar with that from the Eleventh

21   Circuit, 2004.

22        Walmart challenges predominance on two issues:

23   Liability and damages.

24        With respect to predominance, similar to the

25   ascertainability objection or response from Walmart, Walmart

1    applies the wrong standard.  The standard in the Eleventh

2    Circuit is this Carriuolo vs. General Motors case from the

3    Eleventh Circuit, 2016.  That sets forth the standard for

4    predominance.  Couple of quotations that are relevant.

5           The Carriuolo case is important because it applies

6    the predominance standard to a very similar factual pattern.

7    In that Carriuolo case, we have got this Monroney sticker

8    which is the sticker that goes on the side of a new car and

9    describes the warranty, it describes the various terms and

10   conditions of buying that new car.

11          In Carriuolo, General Motors argues that a

12   plaintiff must prove that each and every class member saw

13   that sticker and was subjectively deceived by it.

14          The Eleventh Circuit said no, that's not right.

15   That argument is simply seeking a reliance inquiry by

16   another name.  So here, like the Monroney sticker in

17   Carriuolo, Walmart cannot argue that we have to look at each

18   and every individual class member's reliance on this

19   naturally flavored and no synthetic color, favor or

20   sweetening claims.  You just don't have to do that.

21          Really all you have to do under Carriuolo is look

22   to see whether there is a single common question, and that's

23   the truth or falsity of the label claims.  Walmart already

24   says, we agree that that is one common question.  You only

25   need one under commonality.

1   And then when we look under predominance,
2   Carriuolo says, just need that single common question, truth
3   or falsity of the label claims, we don't need to look
4   individually at each and every one of these class members to
5   determine whether they first off looked at it, second off,
6   whether they relied on it.
7   Predominance under the warranty in Magnuson-Moss
8   claims, express warranty, one of our claims, it's the
9   same -- that claim is the same for Ms. Morris as it is for
10  all class members.  The claim is that the pediatric shakes
11  contain synthetic color, flavor or sweeteners, and
12  specifically here maltodextrin which is a synthetic
13  sweetener, Ms. Morris alleges.
14  And then also that it's not naturally flavored
15  because that vanilla, the vanilla, big letter -- I might
16  even have the bottle -- if I may approach (indicating).
17  That's the vanilla shake, the clean label shake at
18  issue here.  Says vanilla in big words.  And then it says,
19  "naturally flavored" thereunder.
20  So, you know, anybody looking at that thinks,
21  okay, this is a naturally flavored vanilla shake.  Well,
22  when you look at the ingredients list, there's no vanilla
23  there.  There's no derived from vanilla.  It's deceptive.
24  It's a breach of the express warranty.
25  So, Morris and the class often pleaded their

1    importance, the contract under warranty, they bought the

2    shake, Walmart didn't, they mislabeled it, it's deceptive.

3          We have the implied warranty of merchantability.

4    That, under the law, says it must conform to the promises or

5    affirmations of fact made on the container or label, if any.

6    We have got these two claims made on that bottle.

7          ADTPA, again, we have got damages, refund, got

8    premium paid, now we're looking at statutory damages.

9          The Eleventh Circuit has rejected the requirement

10   of proof of individual reliance on misrepresentation under

11   the FTCA.  The ADTPA looks to the FTCA for guidance and

12   application.  That provides a remedy.  And it also provides

13   a remedy in the form of injunctive relief for consumers

14   harmed by unfair or deceptive acts or practices.

15         When we're looking at the ADTPA under the

16   controlling law, we don't have to show individual reliance,

17   we don't have to do an individual analysis for each of these

18   class members.  Also --

19         THE COURT:  Before you move on from that.  My

20   memory, though, you cited me to authority not under the

21   ADTPA for that, just under the FTCA.

22         MR. BARTLETT:  That's correct.  You're right.  It

23   does not address the ADTPA.  It's an analogous case from the

24   Eleventh Circuit, but it is not under the ADTPA.  It is

25   FTCA, and we argue that that -- that's applicable here.

1          We have got common issues regarding damages here.

2     We cited in our brief, and this is black letter law, but the

3     presence of individual damages -- individualized damages

4     does not prevent a finding that the common issues of the

5     case predominate.

6          So, we have got spreadsheets, we've got data,

7     we've got databases from Walmart that show who bought what,

8     the price they bought, the number they bought.  We also have

9     inventory records to determine the on hand inventory in a

10    particular store at a particular time, the historical data,

11    and we have two-week rolling averages as well.  We have all

12    of that information from Walmart.

13         So we're able to determine the damages here,

14    whether, ultimately, the court determines that the damages

15    are a refund of the purchase price; or, after determining

16    the market price, that it should be whether that's a premium

17    paid; and ultimately, if we get there, we can talk about the

18    ADTPA statutory damages.

19         Walmart argues that Ms. Morris didn't present a

20    damages model.  That's just simply not true.  The damages

21    model is not complicated.  We don't have an expert for it

22    because we don't need one.

23         The motion at Pages 6, 14, 15, 20, 28 and 29 and

24    Note 17 on Page 29 set forth the damages claimed, also

25    address how you find those damages.

1    We don't have to calculate the damages at this

2    point in time.  We've just got to say how you would get

3    there and we've done that.

4    Ascertainability.  I talked a little bit about

5    this at the beginning.  But Walmart used the wrong standard

6    in opposing the plaintiff's motion under -- and argument on

7    ascertainability.  The controlling law is Cherry versus

8    Domestic Corp., Eleventh Circuit case, 2021.  We cite it in

9    our brief, we address it, we explain it.  That's the

10   controlling law.  We have got some really good quotes from

11   that.

12   Manageability problems will rarely, if ever, be

13   themselves sufficient to prevent certification.

14   Also says, membership can be capable of

15   determination without being capable of convenient

16   determination.  That's important here because while Walmart

17   argues that you can't look at one spreadsheet to determine

18   who is in this class, we can look a number of spreadsheets

19   from Walmart and data and data bases that Walmart has to

20   determine who is in fact in that class.

21   Walmart has the sales data to identify customers

22   who purchased the pediatric shakes through Walmart.com.

23   That is from the Ayers depo.  That's Pages 13 through 16, as

24   well as the Deposition Exhibit 17.

25   We have got a spreadsheet.  It's WM Morris 2100.

1    It was talked about at the Ayers deposition on Page 21.

2           Included within this spreadsheet and in this

3    deposition testimony is that for every transaction for a

4    subset of class members, and what I mean by this is for

5    Alabama or Georgia, we are just talking about Alabama here,

6    you can get the customer name, you can get the customer

7    email, get the address, you can get the date of transaction,

8    you can get the quantity and type of the pediatric shakes

9    purchased.  You can see the purchase -- you can see the

10   price paid for that purchase.

11          This is all from the Ayers deposition, Pages 15

12   through 26, 29 through 30, all discussing Exhibit 17 to the

13   Ayers deposition.

14          Walmart makes an argument that you can't determine

15   the difference -- you can't determine whether a class member

16   purchased an unclean label shake or a clean label shake.

17          A couple arguments with respect to that.

18          First, Walmart has inventory records.  Walmart has

19   records that show which company shipped which product to

20   which Walmart store.  The company, we can look at the

21   inventory to determine at which point in time a particular

22   store had a particular shake.

23          We can then look at the sales records to determine

24   when each of the Alabama stores sold through those unclean

25   label shakes.  Or, worst case scenario, we have testimony

from Walmart that the shelf life of these unclean label
shakes is twelve to eighteen months.  Worst case scenario.

    We know that the last time an unclean label shake
was shipped to a Walmart store was early February, we can
get the exact date, the 30(b)(6) witness didn't have the
exact date, but they said they have it.  We can get that and
we can determine that at a very minimum eighteen months
after that last unclean label shake was shipped, they didn't
have anymore, the shelf life of those products was gone, had
to be thrown away.

    I do want to point out in the Redford deposition,
and you have all of this up there, but when my colleague
Mr. Lynch deposed Ms. Redford, he got her to admit and to
testify on behalf of the company that upon the cost change
of the unclean label and the clean label shakes from Gehl
Foods, who is the manufacturer of this, that those -- when
the cost changed in Walmart system, the item number of the
product changed.  So, upon the cost change, which would have
been in early 2018, Walmart changed the item number.

    We have testimony -- and I would like to maybe
point out some of these -- there's a number of these
questions and answers.

    If you look at Page 11 of my sheet there, we're
looking at Page 95 of Ms. Redford's deposition, question is:
So when did Walmart change the item number associated with

1    the Gehl shakes?

2         Answer:  The item number would have changed at the

3    point that the retail and cost would have been updated.

4         Question:  So when -- earlier I believe we talked

5    about the formula for the clean shakes increased.  Would

6    that be associated with the cost of the shakes to Walmart?

7         Answer:  Yes.

8         Question:  So did Walmart change the item number

9    when it introduced the clean shakes?

10        Answer:  It would have shipped and potentially

11   sold clean shakes prior to a cost change in our system.  For

12   some of the sales, they would have been associated with the

13   conventional item number.

14        We go on to Page 13 of my little outline there.

15   I'm sorry.  Page 12.  Still in Redford's deposition.  Page

16   141.

17        Okay.  And was this cost change a specific date?

18   We're still talking about the cost change from the unclean

19   label to the clean label.

20        Answer:  There was a specific date but it was

21   processed within Walmart's system.

22        Question:  Do you know when that --

23        Answer:  I don't have it off the top of my mind,

24   no.

25        Question:  Okay.  But Walmart would have a record

1    of that date?

2              Answer:  Yes.

3              Question:  Because they would have paid a

4    different price for the shake after that date?

5              Answer:  That's correct.

6              Question:  And so any time after that date the

7    item number would reflect a clean shake?

8              Answer:  The item number changes when the cost

9    changes to Walmart.  That would be an instance where a new

10   item number would be generated within our system.

11        So after that cost change, the change in item

12   number would reflect the definite move to what's being

13   ordered and what's being processed.  It's a clean label

14   formulation.

15             There are a couple other examples of this.  But

16   what's important is that in the direct examination of

17   Ms. Redford those were her answers.

18             Then after a break, and upon redirect by Walmart,

19   Page 19 of this little set of documents here, we're looking

20   at Page 226 of Ms. Redford's deposition -- again, to be

21   clear, this is Walmart asking its own witness this question:

22             So there's no way for Walmart to tell whether the

23   sale of the shake was a clean label versus a nonclean label

24   shake; is that correct?

25             Answer:  That's correct.

1          Completely contradicts dozens of pages of

2     testimony on direct examination.

3          So, in sum, there is a way to do this, it may be

4     complicated.  But Walmart has data, they've got information,

5     they've got other depositions in here that talk about the

6     extent to which Walmart keeps data and has information on

7     sales, inventory -- happy to go over all that, but it has

8     been cited before and you have it in your record.  But if

9     you would like me to, I'm happy to go over that.

10          THE COURT:  Not needed.

11          MR. BARTLETT:  Okay.  Finally, we can self

12     identify, class members are entitled to self identify.  If

13     you look at our brief, the Collins vs. Quincy Bioscience

14     case, it's Southern District of Florida, March of 2020.  It

15     collects a number of cases and it says, self identification

16     through proof of purchase or affidavit of a class member is

17     a manageable process.

18          So, worst case scenario, we can do that.  I know

19     Walmart cited some case law that we have replied to and

20     explained why it wasn't apples to apples here.

21          One last thing on this, a recent case, Rensel v.

22     Centra Tech, Eleventh Circuit, quotes Cherry.  Eleventh

23     Circuit says, I quote, "we held in Cherry that

24     administrative feasibility is not a requirement for

25     certification under Rule 23."

1            Your Honor, if it's okay, I'm going to let
2    Mr. Hood talk about a couple of things that's the injunctive
3    aspect of it as well as notice.  Of course, if you have any
4    questions, we can address those.
5            THE COURT:  All right.
6            MR. BARTLETT:  Thank you.
7            MR. HOOD:  Good morning, Your Honor.
8            THE COURT:  Good morning.
9            MR. HOOD:  Thank you for this opportunity to speak
10   on behalf of Ms. Morris.
11           I think the injunctive issue is the one I'll start
12   with, the one I think is most important.
13           Walmart's proposition is that a plaintiff like
14   Ms. Morris who complains about deceit and claims damages for
15   that deceit never, and I underscore never, can end the wrong
16   which harmed her.  They explain their proposition.  They say
17   that because Ms. Morris is a complaining plaintiff about
18   deceit, she's aware of the deceit, and she cannot be fooled
19   again.  You know the old expression:  Fool me once, shame on
20   you; fool me twice, shame on me.  They say that can't
21   happen, that's incapable of repetition, therefore, she has
22   no controversy -- she has no prospective interest in
23   correcting the dishonesty that she alleges and, therefore,
24   has no standing to seek equity from this court to put an end
25   to the wrong.

1          You would think with the proposition that, in my

2     view, is extreme, as that one is, there would be

3     overwhelming settled case law which would put the court's

4     mind at ease about ruling in favor of Walmart on this issue.

5     There isn't.

6          In fact, the briefs depict a split in authority.

7     We cite the Davidson case from the Ninth Circuit, they cite

8     a case from the Second Circuit.  Both appellate decisions.

9     But the decision necessary to decide it in their favor, the

10    one from the Eleventh Circuit, is missing because there

11    isn't one.

12         What they have in place of that is a case from

13    federal court in Miami, Wasser, decided by Judge Scola, in

14    which he decided in favor of a defendant making the same

15    proposition Walmart makes and citing to his own prior

16    decision in a different case.  That decision again is Wasser

17    and he cites to his prior decision in a case called

18    Lombardo.  And he said there that there must be an immediate

19    real threat of future injury to this plaintiff.  And because

20    this plaintiff is now aware of the deceit, they can no

21    longer be injured by it.

22         And that's the gist of the Wasser case which is

23    important and significant here, a decision under Florida

24    law, based on the Florida FDUTPA, which is the Florida

25    Unfair Deceptive Trade Practices Act, which is not Alabama

law, it's not Alabama warranty law, it's not Alabama
Deceptive Trade Practice Act.  Different.

         And we know that rights and claims that arise in
state law also carry with them remedies.  These rights and
these remedies are interrelated and correlated, according to
Wright, Miller, you can't separate the two.  By which I mean
that the remedy of a permanent injunction in this case flows
from the Alabama law, not the Wasser law, not the Florida
law, not Judge Scola's opinion or decision on those
nonAlabama matters.

         And I commend for my point that the remedy for the
Deceptive Trade Practice Act violation and the injury, the
economic injury suffered by the plaintiff, is explained in a
case from the Fourth Circuit, DuPont versus Kolon
Industries, two big commercial companies, fighting it out,
well briefed, resourced attorneys on both sides, and that
decision is 894 F. Supp. 2d 691, and it explains and cites
to Wright, Miller on this very point, that rights and
remedies are closely interrelated concepts.  To deviate from
the state's definition of the latter, the remedies, would
change the former, the rights.

         We know when this court hears a claim where the
rule of decision is provided by state law, which is the case
here with the ADTPA and the warranty claims, whether
reviewing it as a matter of supplemental jurisdiction or

1    Erie Doctrine, we know that the rule is there is no reason

2    to exclude from Erie state substantive law the question of

3    final injunctions.  There is no reason to exclude under Erie

4    Doctrine the state substantive law regarding issuance of

5    final decisions.  And there isn't anything in the

6    defendant's brief about Alabama law saying that this

7    plaintiff lacks standing to seek an injunction.

8         Our case, Davidson, from the Ninth Circuit says

9    she does.  Their case from the Second Circuit says she

10   doesn't.

11        THE COURT:  What was the source of that cause of

12   action in Davidson?  California Deceptive Trade Practices?

13        MR. HOOD:  It would not be Alabama law, Your

14   Honor, it would be probably an analog, California statute.

15   In California, there is a lot of arguable analogs to the

16   Alabama Deceptive Trade Practices Act.

17        I apologize for not having a good answer for you

18   on that.  I'm certain it's not Alabama law.

19        Which is why I say the weighty decision that would

20   answer the question for the court, one from the Eleventh

21   Circuit addressing Alabama law on this question, doesn't

22   exist.

23        Secondly, they cite a case called Holland which is

24   from the Eleventh Circuit.  Again, for their same

25   proposition.  Holland is an ADA, American Disabilities Act

lawsuit.  ADA only offers prospective relief.  Title III of the ADA, a plaintiff complaining and filing suit under that only can obtain prospective relief, an injunction.  And because of that, when a plaintiff, like the one in Holland, comes to the court, then the court directs -- the court views the remedy as the entire cause of action and, therefore, it's decided and assessed as a matter of jurisdiction, original jurisdiction, do I have a case for controversy.

It's undisputed here that we have a case in controversy under the ADTPA, that we have a case in controversy under the warranty claims.  It's not disputed that there's an Article III controversy in connection with those claims.

The defendant simply says there's no Article III controversy with respect to the remedy, prospective remedy to those claims.  One remedy among others.  That's unlike Holland.  Holland had one single remedy, one single cause of action, permanent injunction to require compliance with the ADA.  That distinguishes it from this case, along with the other reasons I gave you, which Alabama law is the issue here and not the ADA.

If you will give me just a second, I will explain Holland just a bit further.

Which raises another point in my mind, Your Honor.

1    Typically remedies, the question of remedies, follow the

2    question of merits.  If you're not at the merits decision

3    yet, you're not at the remedies decision yet.  We're not at

4    the merits decision here.  We passed the first merits exam

5    which is the motion to dismiss and we're now at class

6    certification.  We're not here on summary judgment.  We're

7    not here on the quality of the evidence about what Walmart

8    did or did not do, about the wrong or about the actual

9    amount of damages suffered by the plaintiff.

10          So I would argue that this issue of or this

11   proposition, rather, that there's no standing for a remedy

12   is premature.  There clearly is standing in Article III

13   jurisdiction for the claims.

14          So I see no reason to tee up the remedy, which is

15   one among others, at this point, particularly in the absence

16   of controlling precedence.

17          If you have any questions on my argument, I will

18   be glad to take them now or I'll move to notice.

19          THE COURT:  I'm okay.

20          MR. HOOD:  Our brief presents our main points on

21   the question of notice.  It's presented to the judge, to the

22   court, Your Honor, as a question of the plaintiff's

23   adequacy, which of course is why we also reply on the topic

24   of substitution.  It's not presented as a pleading

25   deficiency.  That time is passed.  The motion to dismiss

1    briefing and the decision in this court are in the record.

2    And they're done.  And that applies both to the presuit

3    notice argument of Walmart on the warranty claims and on the

4    ADTPA claims.

5          In particular, or of particular interest, the

6    ADTPA does indeed spell out a presuit demand requirement.

7    And it does so in a section of the statute, 8-19-10E.  And

8    in that provision, it says, this demand requirement, this

9    presuit demand requirement shall not apply, that's mandatory

10   language, shall not apply if a defendant doesn't have

11   property in the state.  That's an integrated provision.

12         Walmart, however, has chosen, for reasons of its

13   interest, to parse and to pick from those provisions.  It

14   says there's a presuit demand requirement, but it failed to

15   take the opportunity to disarm the exception by answering

16   under oath a verified interrogatory answer that it had

17   property in the state such that that exception is disarmed.

18         I would argue that that record means they don't

19   have property in the state for purposes of the exception.

20   They're the only people who can under oath declare their

21   property in the state.  We can't.  They chose not to.  They

22   made an election not to assert property in the State of

23   Alabama.  Therefore, the exception which disarmed, disables,

24   and eliminates any presuit demand requirement on the

25   plaintiff under the ADTPA doesn't operate here.  It's gone.

1    It's done.  Just like their argument.

2              If you have any questions on that, I would be glad

3    to entertain them.

4              THE COURT:  Not at this time.

5              MR. HOOD:  Thank you.

6              THE COURT:  Thank you.  Anything further?

7              MR. BARTLETT:  No, Your Honor, I don't think so.

8              THE COURT:  All right.  I will hear from Walmart.

9    Why don't we take five minutes just to let -- I am getting a

10   good nod from the court reporter.  Let's take five minutes

11   and let everybody stretch.

12             MR. GRESHAM:  Your Honor, if we could maybe take

13   ten minutes.  I think I can shorten mine given some of the

14   things that they touched on pretty well if I can have a

15   second and also get in touch with my witness.

16             Just as a housekeeping matter, how do you want --

17   the way I envision it is I will go through everything until

18   I get to predominance and then I put Ms. Butler on.  I'm

19   happy to put her on first, if that is how you prefer it.

20             THE COURT:  I think probably logically it does

21   make more sense for you to go through until you get to

22   predominance and then we'll get to testimony.

23             MR. GRESHAM:  All right, Your Honor.

24             THE COURT:  Let's take a few minutes.

25                        (Break taken).

1          THE COURT:  Back on the record.

2          MR. GRESHAM:  Thank you, Your Honor.  And I'm Cole

3    Gresham for the defendant.

4          Your Honor, I intend to start with standing,

5    because I think that's sort of the logical portion, because

6    they need to establish standing before anything else

7    happens, but I'm happy to address in any order the court

8    would like.

9          So I'm going to go standing, ascertainability, and

10   then we'll call Ms. Butler, and I'll go through the

11   examination.  We've talked, and so I will do my direct,

12   he'll do his cross-examination, and then I'll finish my

13   argument.

14         THE COURT:  All right.

15         MR. GRESHAM:  All right.  First here, and most

16   importantly here, the plaintiff, the named plaintiff

17   Ms. Morris, lacks standing to pursue the claims against

18   Walmart because she was not injured.

19         The Eleventh Circuit is clear in the Prado-Steiman

20   case that any analysis of class certification must begin

21   with the issue of standing.

22         The TransUnion case, the Supreme Court of the

23   United States recently stated that "every class member must

24   have Article III standing in order to recover individual

25   damages.  Article III does not give federal courts the power

1  to order relief to any uninjured plaintiff, class action or

2  not".

3          Here the evidence proves Ms. Morris lacks

4  standing.  I'm not going to go through it here because

5  plaintiffs admitted that the prior version of the shakes did

6  not contain the label claims at issue here.  In other words,

7  they didn't claim to be naturally flavored and they didn't

8  claim to contain no synthetic colors, flavors or sweeteners,

9  and those were the products that were on the market until,

10  as plaintiff conceded again, the clean label shakes were

11  shipped some time in February of 2018.

12          The problem for Ms. Morris, however, is that she

13  first purchased pediatric shakes on December 30th, 2017.

14          THE COURT:  Let me ask you this, I know that in

15  the briefing you guys both mentioned, and you just said it

16  again now, that it was some time in February of 2018 that

17  the clean label shakes shipped.

18          MR. GRESHAM:  Yes, Your Honor.

19          THE COURT:  Are y'all being vague because you

20  don't know or have you already established that you're not

21  going to be able to know the actual date?

22          MR. GRESHAM:  Your Honor, at this point, we do not

23  know the specific actual date they shipped.  I'm not sure

24  that's available.  But I also don't know that it's not

25  available.

1          We have an email from the supplier in this case of

2     the clean label shakes that from -- I think it's dated, and

3     I can pull it up if Your Honor would like to see it, it's

4     dated February 26 of 2018, and it says the clean label

5     shakes should begin shipping this week.

6          So it could actually be March, but for purposes of

7     this, we're assuming that they shipped in February.  But

8     that has not been officially established.

9          But here, we can show that Ms. Morris first

10    purchased the pediatric shakes on December 30th, 2017.  So,

11    undeniably the first time she purchased the shake she

12    purchased the nonclean label version of the shake.

13         Ms. Morris purchased the shake at least five more

14    times prior to the label change.  She purchased them on

15    January 2nd; she purchased, it looks like, three products on

16    January 10th, 2018; she purchased it on January the 19th,

17    2018; February 4th, 2018; February 10th, 2018; and February

18    25th, 2018.  All of these would have been the nonclean label

19    shakes that did not include the at issue -- the at issue

20    claims on the label.

21         If you'll go to slide four.  This is the prior

22    version of the shake.  And as you can see right there, it

23    specifically claims to be artificially flavored and nowhere

24    on here does it claim to contain no synthetic colors,

25    flavors or sweeteners.

This would have been the label that Ms. Morris purchased every single time she purchased it in those first five instances where she purchased the shake.

And as you can see, Ms. Morris continued to purchase the shake at regular intervals twenty -- approximately twenty more times from late February 2018 through October 2019.  And she purchased these in regular intervals.  Starting from the very beginning when she purchased them, she purchased them multiple times a week by and large throughout the entire time she purchased, through October 19th, 2018, including when she purchased the previous nonclean label shakes.

So there was no -- she purchased the clean label -- nonclean label shakes, took a break, and then came back to the product.  This is a product she purchased on a regular interval throughout the entire time she purchased it.

And here Ms. Morris' purchase records confirm that she paid the exact same amount for every single pediatric shake she purchased, whether the shake was a clean label shake or not.

Slide twelve.  As you can see from her first purchase or for her first purchase on December 30th, 2017, prior to the label change, she again -- she paid eight dollars and forty-eight cents for the shakes.

1          Now if you go to slide thirteen.  On her last

2    purchase on October 19th, 2018, after the label change, she

3    again paid eight dollars and forty-eight cents for the

4    shakes.

5          In sum, the evidence proved that she paid the same

6    for the shakes, saying they were artificially flavored and

7    did not contain a representation that they contained no

8    synthetic colors, flavors or sweeteners, as she did for the

9    clean label shakes which contained the claim to be naturally

10   flavored and to contain no synthetic colors, flavors, or

11   sweeteners.

12         This is the evidence of the market price that

13   Mr. Bartlett was harping on here.  We don't need any more

14   discovery.  We know exactly what the product would have sold

15   for without the claim to be naturally flavored and without

16   the claim to contain no synthetic colors, flavors or

17   sweeteners.  We know it because Walmart sold the exact same

18   product without those claims.  And, Ms. Morris purchased the

19   exact same product without that claim.  And, she paid the

20   exact same amount for both of them.  That is the

21   information.  That would be the market price.

22         Here, she purchased -- she said in her complaint

23   that, yeah, I paid a premium.  But, the Supreme Court is

24   clear -- the Supreme Court is clear that there must be a

25   rigorous analysis and that you are to look behind the

pleadings.  The pleadings, they couldn't just rely on these

pleadings, especially given Ms. Morris' testimony and the

evidence here that she paid the same amount of money.

Plaintiffs are, in essence, asking the court to

sort of bury its head in the sand and ignore the evidence of

Ms. Morris' actual purchase and the prices charged by

Walmart for products that don't contain the label claims.

That is the best evidence of the market price here.

THE COURT:  What is your response to their

argument that the market value is a merits question?

MR. GRESHAM:  Well, the Supreme Court, I believe

that is slide eighteen, if you'll pull that up.  This is the

Supreme Court's case from Walmart v. Dukes, which is sort of

a seminal case here when we're talking about the analysis

that needs to be performed at the class certification stage.

They say, "it may be necessary for the court to

probe behind the pleadings before coming to rest on the

certification question".  And then at the very end you will

see, nor is there anything unusual about that consequence:

The necessity of touching aspects of the merits in order to

resolve preliminary matters, e.g., jurisdiction, which this

is -- standing is a subject matter jurisdiction issue.  So

this court must resolve the subject matter jurisdiction

issue before it can go on to any other question.  Without

subject matter jurisdiction, this court has no power to make

1    any further rulings in this case.

2              So, the Supreme Court itself has said there is

3    nothing unusual about touching on these things that are --

4    resolving issues that touch on the merits at the class

5    certification stage, and sometimes, in fact, it's actually

6    required.

7              And, Your Honor, I would posit here, it is

8    required because we have to establish subject matter

9    jurisdiction first.

10              Now, you heard Mr. Bartlett get up and say that

11    Ms. Morris was injured because she purchased these shakes.

12              And they cite to the Debernardis case for this

13    proposition which was an Eleventh Circuit case, but the only

14    thing that the Debernardis court concluded is that, and this

15    is slide sixteen, "the plaintiffs plausibly alleged that

16    they suffered an economic loss when they purchased

17    supplements that were worthless because the FTCA prohibited

18    the sale of the supplements".  So there they were saying the

19    difference in the market price was whatever she said and

20    zero.

21              Here, the plaintiff nowhere alleges that she

22    received a worthless product, nor can she, because she

23    previously purchased the shakes without the allegedly false

24    label for the same amount as she paid for the at issue

25    labeled product.

1      Ms. Morris also testified that she didn't suffer

2  any physical harm from the shakes and, in fact, the

3  plaintiffs have removed any allegation or dropped their

4  allegation that she did.

5      Plaintiff's theory that simply purchasing the

6  product is enough runs afoul of the Supreme Court's

7  admonition in TransUnion, LLC vs. Ramirez that a statutory

8  violation does not create standing unless the plaintiff "has

9  been concretely harmed by the defendant's statutory

10  violation."

11      Now, plaintiffs got up and talked a lot about a

12  refund, but I will note that they cite nowhere in their

13  papers, nor can they, that a refund is an appropriate -- a

14  full refund is an appropriate amount.

15      As he noted, the warranty is a contract claim, so

16  it would be a breach of contract style damages that would be

17  at issue here.  So it's not a complete refund.  As he noted,

18  it's the difference between the product -- if it hadn't had

19  -- the market price, if the product had not been mislabeled

20  versus the market price for what was actually paid.  And

21  here, we have that information, because we can show that it

22  was exactly the same.

23      This sort of flows into that same argument, but

24  they argue they paid a premium.  And with a straight face

25  they can't argue she paid a premium for the product.  As we

1  said, we have the evidence of what that market price is.

2  It's exactly the same.

3          Now, plaintiffs rely on this Astiana vs. Ben &

4  Jerry's case.  That case is misplaced for a couple of

5  reasons.  But first and foremost, because there was no

6  evidence in that case as to what the ice cream would have

7  sold for without the all natural claim on the ice cream

8  label, whereas here we have exactly that.  We know exactly

9  what she would have paid for the shakes without the at issue

10 label claims.

11         Finally, they rely on the Alabama Deceptive Trade

12 Practices hundred dollar minimum statutory violation.  The

13 problem with that is that the plain language of the Alabama

14 Deceptive Trade Practices Act says in order to get there,

15 they first have to prove a monetary damage.  So, they don't

16 just get the one hundred dollar violation and nor can they,

17 TransUnion would prevent that, because TransUnion says they

18 can't just create -- statutory awards can't create standing

19 without a concrete injury.

20         In sum, Your Honor, they don't have standing to

21 pursue -- she does not -- the plaintiff does not have

22 standing to pursue this claim.

23         And if the court lacks standing, then the court

24 lacks subject matter jurisdiction and the court can't

25 certify this class, but nor can the court allow for the

1    substitution of a class representative.

2        Slide twenty.  In the case, Northern District of

3    Georgia case, Hunt v. Thermal Insulation, it's quoting

4    several Fifth Circuit cases as well as an Eleventh Circuit

5    case, "Rule 15, therefore, does not permit a plaintiff to

6    amend his complaint to substitute a new plaintiff in order

7    to cure the lack of subject matter jurisdiction".

8        You will see the Wright v. Dowdy case, Eleventh

9    Circuit case, and in the parenthetical, "by lacking standing

10   to bring a claim, the appellants also lack standing to amend

11   the complaint to consolidate with a party who may have

12   standing".

13       So, Your Honor, if she lacks standing here, that

14   cannot be cured by substitution because again the court

15   would lack subject matter jurisdiction to do anything other

16   than dismiss the case.

17       Now, relatedly, Ms. Morris also lacks standing to

18   pursue a Rule 23(b)(2) injunctive class because she is not

19   at risk of future injury.

20       Now, plaintiff's lawyers gave us a hard time about

21   not citing any Eleventh Circuit case.  Well, the Eleventh

22   Circuit law on this is clear, this is the Houston v. Marod

23   Supermarkets case, "the injury-in-fact demanded by Article

24   III requires an additional showing when injunctive relief is

25   sought.  In addition to past injury, a plaintiff seeking

1    injunctive relief must show a sufficient likelihood that he

2    will be affected by the allegedly unlawful conduct in the

3    future".

4         Here, Ms. Morris has made no such showing nor can

5    she.  In fact, she stopped purchasing the shake when she

6    discovered the alleged misrepresentation.

7         As the Southern District of Florida found in the

8    Wasser case, a plaintiff cannot manufacture standing by

9    choosing not to purchase a product because of allegedly

10   deceptive labeling, when the plaintiff actually knows the

11   truth underlying that labeling and thus cannot be deceived

12   by it in the future".

13        Now, that is the only case from this circuit that

14   has been cited to this court.  And plaintiff relies instead

15   on a Ninth Circuit case Davidson versus Kimberly-Clark.

16        In that case, in Footnote 5 of that case, the

17   Ninth Circuit recognized that the other circuits that had

18   reached the issue came to opposite conclusions.  In that

19   case there were also allegations that she intended to

20   purchase it in the future which the court gave credence to,

21   somewhat haltingly, if Your Honor will read that case.  But

22   I would submit that the Supreme Court's admonition in

23   TransUnion, LLC that it has "rejected the proposition that a

24   plaintiff automatically satisfied the injury-in-fact

25   requirement whenever a statute grants a person a statutory

1    right and purports to authorize that person to sue to

2    vindicate that right".  That demonstrates the Ninth

3    Circuit's reasoning that that's flawed.

4         THE COURT:  Under your argument, help me

5    understand how I could ever certify a 23(b)(2) class on,

6    let's say, an Alabama Deceptive Trade Practices?

7         MR. GRESHAM:  There are some deceptive trade

8    practices that may continue harming that person, they may

9    continue harming that person in the future.  But when it

10   comes to purchasing a shake or a product that they claim is

11   deceptively labeled, they realize that it is -- going

12   forward they can't be harmed by it.  I mean, that's what the

13   Houston case stands for that proposition.  They have to show

14   a risk of future injury.

15        THE COURT:  So you are never going to have a

16   consumer class action certified under 23(b)(2) under your

17   argument?

18        MR. GRESHAM:  That's correct, Your Honor.  And I

19   think that is required by the Supreme Court's decision in

20   TransUnion.

21        They made a lot about the fact that the Alabama

22   Legislature gives you the right here.  Well, in TransUnion

23   -- the right for an injunction and to seek an injunction.

24        Well, in TransUnion, Congress had given consumers

25   the right to statutory damages for breaches or misleading

1    information being contained in their credit report.  And the

2    court said that's not enough to create standing.  Even

3    though Congress had given them statutory damages, the court

4    said no, you have to have a concrete harm.

5         Here, the court is clear and the Eleventh Circuit

6    is clear that for a prospective -- in order for injunctive

7    relief, you must show a sufficient likelihood that he would

8    be affected by the allegedly unlawful conduct in the future.

9         THE COURT:  The issue I have here is, we're in

10   23(b)(2), so I have trouble separating out her specific

11   circumstances from the class, and undeniably the class could

12   continue to be affected by allegedly deceptive trade

13   practices, even if the putative class representative has

14   notice of those.

15        MR. GRESHAM:  Right.  But for her to go forward

16   and for a class to be certified the law is also abundantly

17   clear that she must have standing.  The law on that is

18   abundantly clear.  As I'm sure the court is aware, standing

19   is not -- you can't bootstrap standing.  You can't have

20   standing on one claim and that will bootstrap you to have

21   standing on all other claims.  It is a claim by claim, issue

22   by issue basis that you must establish standing.  And here,

23   she must establish it for the 23(b)(3) class and the

24   23(b)(2) class.  Without someone who has standing, there is

25   no class representative; therefore, there can be no class.

1          The next issue we're going to touch on here is the

2   plaintiff is neither typical nor adequate.

3          Typicality and adequacy are "not present if the

4   class representatives are subject to unique defenses that

5   could be central to the litigation".

6          Here, Ms. Morris failed to provide the required

7   presuit notice to Walmart, which has failed to both her

8   Alabama Deceptive Trade Practices Act and, as they concede,

9   to her warranty claims.

10         They admit she didn't provide notice.  And they

11  concede, at least I didn't hear them argue, that her

12  warranty claim should survive because they didn't provide

13  notice to Walmart.

14         THE COURT:  The way I understand their argument is

15  they are claiming that you waived the right to demand

16  presuit notice in two different ways.  First, by not raising

17  it at a 12(b)(6) stage; and secondly, by not responding

18  appropriately to discovery.

19         MR. GRESHAM:  Right, Your Honor.  I will touch on

20  both of those in the order you just hit them.

21         On the 12(b) claims, so, in their briefing, they

22  say that we waived it and here they again argue we waived it

23  because we didn't raise it in a 12(b) motion -- 12(b)(6)

24  motion on the issue.  That's simply not supported by the

25  plain language of Rule 12.  According to Rule 12(h)(1), the

only arguments that are waived by not being raised in a

12(b) motion are personal jurisdiction, venue, insufficient

process, and insufficient service of process.  Neither of

those are affected by her failing to provide adequate

notice.

Rule 12(h)(2) specifically allows motions for

failure to state a claim to be raised at any time, even at

trial.  So, under Rule 12, we have not waived anything by

not raising it here.

Moreover, had Walmart asserted the lack of notice

defense in a 12(b) motion, it would have been denied because

plaintiff falsely alleged that she gave notice.  So it was

not ripe to be decided.  It was only after we actually sent

her interrogatories and took her deposition that plaintiff

admitted that she did not in fact give the required notice.

And then they argue that we waived it because

we -- they say Walmart does not maintain a place of business

or keep assets in this state.  And they're right, but that

is an exception that they don't keep -- and we noted that in

a footnote in our brief, that that is an exception to the

Alabama Deceptive Trade Practices Act, notice requirement.

If you'll go to slide twenty-five.  The problem

with their argument that we have somehow waived it is this

is the answer to the complaint, so the first part is their

allegation, the second part is our answer.  And they say,

1    specifically, the promotion, sale, marketing, and

2    distribution of their products, Walmart's products,

3    including the shakes, in this state, through its one hundred

4    plus stores and multiple distribution warehouses located in

5    this state.  Plaintiff's own complaint demonstrates that we

6    have hundreds of stores and multiple distribution warehouses

7    in the state and, in response, admit that the court has

8    personal jurisdiction over Walmart.

9         The assets in the state, as the Southern District

10   of Alabama noted in Nelson v. Nationstar Mortgage, need not

11   be substantial.  Although here they are, as I would argue

12   hundreds of stores and multiple distribution centers is

13   substantial.  In fact, in the Nelson case, the court, the

14   Southern District of Alabama found a single mortgage in the

15   state was sufficient.

16        Now, plaintiff makes much over Walmart's

17   objections to its discovery and Walmart did object to the

18   plaintiff's discovery relating to its assets as irrelevant

19   and overbroad and Walmart's responses were appropriate.

20        The requests were irrelevant because Walmart had

21   already admitted that it had hundreds of stores and multiple

22   distribution centers in the state.

23        Slide twenty-six.  As the Eleventh Circuit noted,

24   "indeed facts judicially admitted are facts established not

25   only beyond the need of evidence to prove them, but beyond

1    the power of evidence to controvert them".

2    So Walmart objected because there was nothing to

3    controvert.  There was no controversy here.  They had

4    alleged it and we admitted it.

5    Walmart also objected to these requests as

6    overbroad as they sought a listing of every single place of

7    business and asset Walmart keeps in this state.  In other

8    words, plaintiffs sought to have Walmart catalog every store

9    fixture, product and cash held in its Alabama stores, all in

10   the name of discovering something that had already been

11   conclusively established in this litigation.

12   Notably, plaintiff's counsel never sought

13   clarification, never took issue with or filed a motion to

14   compel Walmart's responses to these discovery requests.

15   So, Your Honor, I believe that those specifically

16   address both of theirs in that their admission to not

17   providing the presuit notice is fatal here to all of

18   Ms. Morris' claims.

19   And then to address the substitution issue, if

20   plaintiff is not typical or adequate, she should be allowed

21   -- the plaintiff should not be allowed to substitute a new

22   named plaintiff.

23   As the Northern District of Georgia said in the In

24   Re: Atlas Roofing Corp. Chalet Shingle, Product Liability

25   Litigation said, "courts generally deny motions to add or

substitute class representatives prior to class

certification".

       And then in Bailey versus Cumberland Casualty

Insurance Company, the Eleventh Circuit held that the

magistrate court did not abuse its discretion by denying the

putative class the opportunity to name an additional lead

plaintiff.

       The court emphasized the difference between a

putative class and a certified class.  A putative class does

not maintain separate legal status from that of a named

plaintiff, but once certified, a class requires a separate

legal status.  The court also noted that the putative class

members were not prejudiced by the lower court's denial

because their individual claims were tolled at the time the

class action was filed.

       Plaintiff's reliance on Mills v. General Dynamics

is misplaced, as the original named plaintiff's claim in

that would have continued to be live.  In that case, the

named plaintiff had only become non-responsive.

       Here, Ms. Morris' claims are barred by the fact

that she did not give notice.  So there would be a class

action without a plaintiff while they are searching for a

new named plaintiff to substitute.  Whereas in Mills, the

named plaintiff still had a viable claim, they were not --

they thought they were not adequate anymore because they

1    ceased to be responsive to plaintiff counsel.

2            Also, in Mills v. General Dynamics, there had

3    already been two opt in plaintiffs identified, which sets

4    that apart from the case here as well.

5            And then plaintiffs also rely on Sullivan versus

6    Government Employees Insurance.  Again, this case is

7    different because the class had already been certified in

8    Sullivan, and as the Eleventh Circuit recognized in Bailey,

9    a class that's already been certified requires a separate

10   legal status.

11           Moreover, as Sullivan, the case they cite

12   recognized, even if substitution were to be considered,

13   plaintiff must first show good cause under Rule 16.  As a

14   deadline for amending the pleadings past in this case on

15   December 4th, 2020.

16           Go to slide thirty-six.  So, as the Sullivan case

17   that they rely on says, to demonstrate good cause, the

18   movant must establish that despite its diligence, the

19   deadline could not have been met.  Three factors are

20   relevant to that inquiry.  The first is, if the moving party

21   neglected to determine facts before filing the pleadings or

22   within discovery -- here, the presuit notice -- and this

23   really goes to one and two, which is the subject matter of

24   the motion to amend was readily available to the moving

25   party.  Here, it was exclusively within their knowledge.

1    Before the complaint was filed, they could have asked

2    Ms. Morris or they could have provided notice themselves to

3    Walmart before filing.  This is something they have known or

4    should have known from the time they filed the complaint

5    nearly three years ago.

6            Finally is if the moving party delayed filing the

7    motion to amend.  Here, it's been nearly three years since

8    the case was filed and they should have known of the

9    inadequacy of Ms. Morris, and almost a year since she

10   answered or served the answers to our interrogatories in

11   which she admitted that she had not provided notice.

12           So they have not been diligent, and so they have

13   not met the good cause requirement of 16 even if the court

14   were inclined to allow such a substitution.

15           Unless Your Honor has questions, next up would be

16   my predominance argument, so we can get Ms. Butler on the

17   line and do her examination.

18           THE COURT:  Go ahead.

19                    SARAH BUTLER, SWORN

20           COURTROOM DEPUTY:  State your name for the record.

21           THE WITNESS:  Sarah Melissa Butler.

22                    DIRECT EXAMINATION

23   BY MR. GRESHAM:

24   Q    Ms. Butler, can you please tell the court about your

25   background and experience.

1    **A**    Sure.  I am a managing director, and I am the chair

2    of NERA, economic consulting survey and statistical

3    practice.  I have a research group here.  And I have a

4    graduate degree in social statistics from Temple University;

5    graduate degree from Trinity College; and undergraduate

6    degree as well in sociology and history.

7    **Q**    Approximately how many surveys have you -- consumer

8    surveys have you conducted in your career?

9    **A**    So, I have worked in survey research for over twenty

10    years, so I have done hundreds and hundreds of surveys.

11    **Q**    Have you ever given surveys in court or testified in

12    court?

13    **A**    Yes.  I have testified at bench trials as well as

14    jury trials.  I worked with state attorney generals.  I have

15    worked with the Department of Justice.

16          So, yes, I have testified in court and before the

17    ITC, the copyright board.

18    **Q**    What were you asked to do here in this case?

19    **A**    I was asked to design research to evaluate or

20    ascertain the reasons that consumers purchased vanilla and

21    chocolate pediatric shakes, the Walmart brand pediatric

22    shakes.

23    **Q**    Can you walk the court here through how you designed

24    the survey?

25    **A**    Sure.  So, generally speaking, when we're designing

1  survey research, we have to figure out who is -- who we are

2  going to survey, how we are going to identify those people,

3  what questions we will ask, and then how we will analyze the

4  data.

5      So, in terms of the who, the who here are the

6  individuals who have purchased this shake at issue; that is,

7  who have made purchases post 2018.  So we made sure that the

8  sample includes individuals who have bought the shakes in

9  the relevant time period.

10      Now, obviously some of those individuals bought

11  prior to 2018, so that's the who.

12      How do we go out and find those people.  Well,

13  there's not a list of every single individual who purchased

14  these products.  Some people buy these products with cash,

15  so there's not some comprehensive list of every single

16  purchaser.

17      So the way that we identify a population to

18  survey, when we don't have complete and comprehensive lists,

19  is we often, as researchers, turn to internet panels.  If

20  you think about -- again, as I said, I've been doing this

21  for awhile.  We used to go into shopping malls and try to

22  find people or call people's houses.  Most people don't

23  answer the phones anymore, many people don't even have land

24  lines and it's not really a good representation to go into a

25  couple of shopping malls.

1          So these internet panels, if you think of them,

2     they're almost like Neilson ads, we just have set top boxes

3     to track people's television watching.  So there are

4     millions and millions of U.S. consumers who agreed to

5     participate in survey research.  The representation of these

6     panels or the distribution of demographic characteristics of

7     these panels is managed such that the population of these

8     panels looks like the population of the U.S. by gender, by

9     age.

10          So, using these panels allows us to essentially

11    tap in to the U.S. population and then we screen for

12    respondents who would be qualified.

13          So, of course, not everybody in the U.S.

14    population has bought the products at issue.  So we ask a

15    series of questions to identify the relevant purchasers.

16          Once we have identified that relevant pool of

17    purchasers, we ask a series of open and closed-ended

18    questions.  Open-ended questions are questions, I would

19    suggest a question like, why did you purchase this product?

20          The benefit of that kind of question is that it

21    does not impose any category, particular thoughts, bias

22    needs, it is completely open ended, so a respondent can

23    answer in whatever way they see fit.

24          The drawback or potential limitation of an

25    open-ended question is that it can be hard to think of all

1    the reasons you may have purchased a product.  So we have an

2    open-ended question.

3         We also supplement that with a closed-ended

4    question.  Sometimes those are called unaided recall and

5    aided recall.

6         So when we supply people with a list of possible

7    reasons for purchasing the product, that may help jog their

8    memory, oh, yeah, that's another reason I purchased the

9    product.  So we have both open ended and closed-ended

10   questions.

11        We ask survey responders about the first time they

12   purchased the product as well as the most recent time.  So

13   each person gives us essentially two data points that we can

14   look at their reasons for purchase.

15        And then, of course, we have the data.  We do all

16   of our quality control tests so respondents that, for

17   example, in an open-ended question, just type in nonsense,

18   we remove those respondents and have them replaced.

19   Respondents who pick every single choice on the survey -- so

20   we go through a whole series of data cleaning processing.

21        We end up with our final sample and then we

22   analyze the results.

23   Q    Now, is the survey that you designed and performed

24   here, is it consistent with the generally accepted practices

25   in the industry?

**A**      Sure.  I mean, there are, again, a whole series of

quality controlled research standards that include things

like rotating answer choices, screening questions to ensure

that respondents are actually qualified for the survey.

Back end data checks -- so there's a whole series of

processes that I follow in my research and that are research

guidelines that people like me follow to ensure that the

data are reliable.

**Q**      What did you do here to confirm that the survey

respondents had actually purchased the Parent's Choice

Pediatric Shakes?

**A**      Sure.  So, in a case like this, for a product that is

a -- what we would consider kind of a low end investment,

it's not a car or a mortgage, we wouldn't expect respondents

to have receipts or the product sitting on their shelf.  So

the way in which we address the need to ensure that the

individual has actually purchased the product at issue is we

develop a whole series of screening questions.  And those

screening questions have other products, other flavors,

other things as a part of those screening questions so that

no respondent knows, while taking the survey, aha, this is

what the researcher is looking for.

          Sometimes it's called masking or disguising, but

that's the purpose and the standard approach of screening

questions.

1          We include other products that are irrelevant so

2     that no single respondent can essentially guess to be

3     qualified.

4     **Q**     In your opinion were these controlled sufficient to

5     make sure that the respondents had actually purchased the

6     shakes?

7     **A**     Sure.  I mean, so, not only do we have the control,

8     but again, no respondent is going to be kind of trying to

9     game the system.  But again, we have open-ended data where

10    people are explaining why they bought the particular product

11    at issue.

12         So we have data from over four hundred respondents

13    who articulate actual reasons for their response.  Things

14    like, I compared it to Pediasure, I know the Walmart brand,

15    so they are providing us actual data to confirm that these

16    are products that they actually have purchased and were

17    interested in.

18    **Q**     Now, are these controls consistent with the generally

19    accepted practices in the industry?

20    **A**     Yes.  So, I mean, these are types of processes that

21    you would see discussed at places like the American

22    Association for Public Opinion Research.  So, they are

23    standard practices that are used to help us identify

24    actually qualified respondents.

25    **Q**     Why didn't you use Walmart's contact information to

1    contact confirmed purchasers?  Walmart has a list of

2    approximately fifty-four thousand purchasers.  Why didn't

3    you use -- that are Walmart.com account holders, why didn't

4    you use that list?

5              MR. BARTLETT:  Excuse me, Your Honor, we're not

6    sure, is this witness tendered as an expert or do you intend

7    to do that?  We would like voir dire on this with this

8    expert.

9              MR. GRESHAM:  Yes, Your Honor, I would tender the

10   expert or the witness as an expert, Your Honor.

11             THE COURT:  You're saying you would like voir dire

12   before we do that?

13             MR. BARTLETT:  Yes, Your Honor.

14             THE COURT:  All right.  I will allow it.

15             MR. BARTLETT:  Thank you.  Sorry to interrupt.

16             MR. GRESHAM:  You're good.

17                     VOIR DIRE EXAMINATION

18   BY MR. BARTLETT:

19   Q     Hey, Ms. Butler, how are you doing?

20   A     Good morning.  How are you?

21   Q     Good.  Good to see you again.  Can you hear me okay?

22   A     I can.

23   Q     I just want to ask you a couple of questions.

24             Is it true that you didn't ever use the list of

25   known purchasers of the clean shakes when you conducted your

1  survey?

2  **A**      That's true.  I did not rely on the list.

3  **Q**      Is it true also that you didn't limit your survey to

4  those in Alabama who purchased the shake in Alabama?

5              MR. GRESHAM:  Your Honor, this isn't going to her

6  qualifications as an expert.  It's going to the specific

7  survey.  If he wants to question her qualifications, that's

8  different than questioning how she actually performed the

9  survey here.

10             THE COURT:  Help me with that, Mr. Bartlett.  Is

11  this laying the groundwork for you to question her

12  qualifications?

13             MR. BARTLETT:  Well, it got a little complicated,

14  Your Honor, because we kind of went past the voir dire,

15  right, past the qualification.  Mr. Gresham got into a

16  number of substantive issues before tendering the witness.

17  I guess --

18             THE COURT:  I think the best way to do this, if

19  you have questions that are tailored to establishing whether

20  or not she is an expert on surveying and statistical

21  sampling practices, then I will allow that now.  If it goes

22  to more specific information about this survey, then I would

23  like for that to be done at the conclusion of direct

24  examination.

25             MR. BARTLETT:  I'm getting towards methodology, so

I'm not sure -- if Your Honor would let me know whether you want that now or later.  The challenge we intend to make is to the methodology of the --

THE COURT:  That to me does not seem like it's really the gatekeeping side of this.  It's more challenging what she did in this specific case.

MR. BARTLETT:  Okay.

THE COURT:  Understanding that, you're offering her as an expert on -- did I articulate that right?

MR. GRESHAM:  Yes, sir.  I am offering her as an expert in performing consumer surveys and statistical analyses that go along with those surveys, Your Honor.

THE COURT:  Are you objecting to that tender?

MR. BARTLETT:  Yes, Your Honor, we're objecting to the methodology used.

THE COURT:  Okay.  Well, I'm going to receive her testimony on her methodology before we start talking about your objection to the methodology.

MR. BARTLETT:  Thank you.

MR. GRESHAM:  Thank you, Your Honor.

DIRECT EXAMINATION (continued)

Q     All right.  So, Ms. Butler, I think the question we were on is why didn't you use Walmart's contact information for these, of confirmed purchasers, I believe there is a list of Walmart.com account holders, why didn't you use that

1    list?

2    **A**    Sure.  So, that list is a subset of individuals who

3    purchased that have a particular characteristic; that is,

4    they are Walmart.com purchasers or account holders.  And

5    therefore, that -- the correlation, the brand, and

6    potentially the product at issue, and without knowing how

7    those particular individuals may differ from a population of

8    individuals who are not Walmart.com holders who have

9    purchased via cash or just in some other way, rather than a

10   list that we know does not represent the entire population,

11   we randomly sample into a broader -- in fact, some of the

12   respondents we have in the survey may very well be the

13   Walmart.com individuals or account holders.

14            So we use a larger population to draw from to

15   ensure that there is not a bias from the get go of using the

16   subset of the population.

17   **Q**    And are there any methodological reasons why you

18   wouldn't reach out to the respondents using Walmart's

19   contact information?

20   **A**    Sure.  Again, so, the population -- subset -- of what

21   we know to be or --

22            THE REPORTER:  Can she repeat that?

23   **Q**    You broke up.  Could you start that over from the

24   beginning?

25   **A**    Sure.  So, there's obviously first the methodological

1    reasons that we don't want to start with a subset of the

2    population that may have a correlation to the topic of

3    interest; right?  So Walmart.com account holders may have

4    different brand preferences, different purchase behaviors

5    than a larger population of individuals who don't

6    necessarily have a Walmart.com account.

7              Secondly, using a list of emails like that

8    requires me to send essentially unsolicited email

9    invitations to a pool of potential survey respondents.

10             Individuals may wonder why they are getting

11   unsolicited emails, and that violates what we consider or

12   classify as the standard of double-blind research; that is,

13   we don't want respondents to know why or who is potentially

14   sponsoring the research because that may in fact affect

15   their answers.  So, if we send an email saying hey, we know

16   you're a Walmart.com account holder, respondents may

17   consciously or unconsciously change their answers because

18   they may think they will get a coupon or something from

19   Walmart.com or a discount.  And of course we want the

20   research to be unbiased.  So when we use a panel, neither

21   the panel nor the respondent knows who is sponsoring the

22   research or what the intention of the research is.

23   **Q**    And how many respondents did you end up with in this

24   case?

25   **A**    We had four hundred two respondents in the survey.

1  **Q**      Was this sample size sufficient for you to draw any

2  conclusions?

3  **A**      Sure.  So, a sample size of four hundred and two

4  respondents, again, with many of those respondents, over

5  three hundred of them, providing multiple data points, so

6  multiple purchases, is certainly sufficient data for me to

7  look at behavioral patterns across a wide population.

8  **Q**      What was the breakdown here between purchasers of the

9  vanilla shake and purchasers of the chocolate shake?

10 **A**      So, if I could just look at my report.  There are

11 certainly overlaps, but there are two hundred eighty-three

12 vanilla purchasers for the most recent purchase, and two

13 hundred ninety for the chocolate.  And again, there's

14 substantial overlap in individuals who have purchased both.

15 **Q**      And this survey wasn't limited to Alabama purchasers.

16 Why did you not limit this survey to Alabama purchasers?

17 **A**      Sure.  So, at the time we did the work, I believe the

18 complaint was for a nationwide class with a subclass of

19 Alabama purchasers.  Moreover, my understanding is that the

20 products themselves don't or the labeling at issue doesn't

21 differ by state, so there is not a different label going in

22 to different states.

23 **Q**      Does the fact that this was a national survey make it

24 any less relevant to a class of Alabama purchasers in your

25 opinion?

1    **A**    No.  I mean, I think this isn't -- there's no reason

2    to think there is a geographic correlation between purchase

3    motivations and the products at issue here.

4         So, for example, we're not -- we're not surveying

5    cars that are convertibles and trying to look at states like

6    Vermont and draw conclusions about states like Florida.  So

7    there's not some reason that we would think there is a

8    correlation between geographic location here, interest in

9    purchasing these particular shakes.

10   **Q**    Were the survey respondents here paid?

11   **A**    Yes.  I mean, basically in almost all of our

12   research, except for something like the U.S. Census Bureau,

13   we certainly compensate respondents for taking the time and

14   effort to provide their opinion.

15   **Q**    Is it a generally accepted practice to pay survey

16   respondents?

17   **A**    Yeah.  And, I mean, in terms of payment, I mean, I

18   think we should remember that these respondents are getting

19   compensated small amounts of -- the way the system works is

20   it's points to participate in a survey, to the amount of a

21   dollar or two.  And that's standard.  That's the same

22   process I use for work I have done for state attorney

23   generals and the Department of Justice.

24   **Q**    What percentage of surveys that you design involve

25   paid respondents?

1  **A**      I would say almost one hundred percent of them.

2  Sometimes we do work with doctors and rather than pay those

3  doctors they donate to a charity of their choice.  But

4  there's essentially compensation, again, for the time and

5  effort and the time it takes to provide their opinions.

6  **Q**      And do the survey or do the respondents know what the

7  survey is about when they start the survey?

8  **A**      No.  No.  And I think to some extent they don't know

9  what the survey is really about even when they finish the

10  survey.  A respondent receives a general email, the email

11  doesn't indicate the topic of the survey.  Again, the

12  screening questions are designed such that respondents don't

13  know who we are actually looking to interview.  And the

14  questions are carefully constructed to ensure that

15  respondents aren't biased or led to select any particular

16  item or reasons for purchasing.

17  **Q**      In this case did you show the respondents a picture

18  of the label or the product at issue here?

19  **A**      No.  So, this is not a test of the stimulus, so we're

20  not testing the actual label, trying to understand people's

21  interpretations when they read the label.  It's not a

22  reading test.

23  **Q**      Now, in other surveys you have performed you have

24  shown respondents a copy of the labeling.

25          What would be the difference between those surveys

and the survey you have conducted here where you didn't show them the label at issue?

A    Sure.  In surveys where we have done actual label tests, we are often including or it's standard to include both past purchasers of the products and prospective purchasers of the product so that we can understand, again, how a label is interpreted.  Of course, we can ask past purchasers about their understandings of the label, but if somebody is a prospective purchaser and hasn't yet purchased the product, we really have to show them a label.

So, when we're doing actual label testing, especially because we have prospective purchasers as part of our sample, we include showing the label as part of the experimental design.

Q    For the survey you conducted here is it a generally accepted practice in the industry not to show the respondents the label?

A    Yes.  I mean, I'm not asking a reading test or an impression or an interpretation of the label.  I am asking respondents to indicate why they have purchased the product. That may be label statements, certainly those things are included as part of the aided question, there may be other reasons.

But again, it is not a reading and interpretation of the label test.  That's not the study that was designed

1    here.

2    **Q**      In this survey did you calculate a margin for error?

3    **A**      No.  A margin of error is mathematically only correct

4    when one has done a probability sample.  And a probability

5    sample can only be conducted when every element of the

6    population -- so here, every purchaser is known and has a,

7    what we call a nonzero probability of selection.  That means

8    essentially we would have to have a list of every single

9    purchaser and have a means by which we could sample and

10   qualify or reach out to every single purchaser.  Such a list

11   for this product doesn't exist.

12   **Q**      So here are you saying you could not have done a

13   probability sample?

14   **A**      That's correct.

15   **Q**      And so you chose a convenient sample here?

16   **A**      Yes.  And a convenient sample, perhaps it, I mean, it

17   means something in research, but perhaps it sounds like it's

18   just an easy way to do things.

19        A convenient sample doesn't mean that there aren't

20   rigorous standards we have to follow to ensure that the

21   results from a convenient sample are reliable.  It just

22   means that it is not a probability sample in which, again,

23   every element has a known nonzero possibility of selection.

24   **Q**      You mentioned that there were rigorous standards for

25   those convenient samples.  Were those followed here in this

1    survey?

2    **A**      Yes.

3    **Q**      And are convenience samples a generally accepted

4    practice in the industry in doing this sort of market

5    research?

6    **A**      Yes.  Certainly in market research, and research

7    that's done for litigation and academic research, it is a

8    standard type of sampling from a population.

9    **Q**      Does the fact that this was a convenience survey

10   preclude us from relying on the results of that survey?

11   **A**      No.  Again, a convenience sample is just another

12   means by which to draw from a population.  It doesn't mean

13   in and of itself that some results are unreliable or even

14   less reliable than a probability sample.

15   **Q**      Now we're going to turn to the results of the survey

16   that you conducted.

17          Did the survey here ask respondents when they

18   first purchased the shakes?

19   **A**      Yes.

20   **Q**      And what did you find out about how many of the

21   respondents first purchased shakes prior to 2018?  In other

22   words, prior to the clean label shakes being rolled out.

23   **A**      Yes.  About thirty percent.  It's actually thirty

24   point one percent, if I look at the table in the report.

25   **Q**      Your survey asked respondents both open ended and

closed-ended question.  Can you explain the purpose of

including both types of questions in the survey?

**A**     Sure.  Again, an open ended is exactly as it sounds.

It is a question that allows for a free form written

response from the respondent and allows them to articulate

in their own words the reasons for purchasing the product.

A closed-ended question provides respondents with

a list of possible reasons -- I always make sure to also

include an other category to the extent that providing that

closed-ended list also makes somebody think of something

else that is not included on that list.

And then we can use both of those types of

questions to really get a comprehensive evaluation of why a

person purchased a particular product.

**Q**     When you asked the respondents the open-ended

question of why they first purchased the shakes, did any of

the respondents indicate they first purchased the shakes

because the shakes contained no synthetic colors, flavors,

or sweeteners?

**A**     No.

**Q**     When you asked respondents the open-ended question of

why they first purchased the shakes, did any of the

respondents indicate they first purchased the shakes because

the shakes were naturally flavored?

**A**     There were five respondents.

1   **Q**      Were any of those respondents purchasers of the

2   vanilla shakes?

3   **A**      No.

4   **Q**      Now, after you gave respondents a list of potential

5   reasons for why they purchased the shakes, including that

6   they were naturally flavored and contained no synthetic

7   colors, flavors, or sweeteners, what percentage of people

8   did not first purchase the shakes because of the claims to

9   be naturally flavored or it contained no synthetic color,

10  flavor, or sweetener?

11  **A**      Sure.  So, looking across both of the chocolate and

12  vanilla, approximately seventy percent of respondents who

13  first -- when articulating reasons for their first purchase

14  did not indicate that they purchased the product because it

15  was naturally flavored or had no artificial sweeteners.

16  **Q**      Did you also ask repeat customers why they continued

17  purchasing the shakes?

18  **A**      Yes.

19  **Q**      Did you do this in the same open ended and closed

20  ended format as you did for the first purchases?

21  **A**      That's correct.

22  **Q**      When asked the open-ended question, did any repeat

23  purchasers say they purchased the shakes because of the

24  claims to contain no synthetic colors, flavors, or

25  sweeteners?

**A**     I do not believe any respondents indicated that, no.

**Q**     So none of them, in response to the open-ended question, none of the repeat purchasers said they continued purchasing the shakes because they contained no synthetic colors, flavors, or sweeteners?

**A**     I believe that's correct.  Yes.

**Q**     When you asked the repeat purchasers the open-ended question of why they continued purchasing the shakes, did any of them say they continued purchasing the shakes because of the claims to be naturally flavored?

**A**     I believe it's one respondent.

**Q**     Was that for the vanilla shakes?

**A**     That's correct.  That was one respondent for the vanilla shake.

**Q**     Now, again, when asked a closed-ended question and given the list of reasons for purchasing the shakes, including both of the at issue label claims, what percentage of purchasers indicated they continued purchasing the shakes for reasons other than the claim to be naturally flavored and containing no synthetic colors, flavors, or sweeteners?

**A**     Yes.  Again, across both products, when we do the estimation, it's about sixty-five percent.

**Q**     Now, did the respondents to this survey, the reasons for them purchasing the shake, did it vary widely amongst the group?

1    **A**    Yes.

2    **Q**    And based on the results of your survey were you able

3    to draw any conclusions?

4    **A**    Sure.  I mean, so I think, as you noted, respondents

5    have a wide range of reasons for purchasing the product,

6    both initially and subsequently.  Many referencing things

7    like doctor recommendation.  Some respondents say things

8    like it was on sale and I wanted to try it.  Others

9    referencing things like the comparison to Pediasure, so

10   being a cheaper brand of the national brand.  But again,

11   across a wide range of answers and reasons for purchase.

12   Even when provided with a list to aid recall, seventy to

13   sixty-five percent of respondents don't select the naturally

14   flavored or the no artificial sweeteners statements at issue

15   here as reasons for purchasing the product.

16          MR. GRESHAM:  Thank you, Sarah, that's all I have.

17   And I would like to proffer her as an expert witness.

18          THE COURT:  I'm going to reserve ruling on that

19   until I hear from the other side.

20          MR. GRESHAM:  Yes, Your Honor.

21          MR. BARTLETT:  May we cross-examine, Your Honor?

22          THE COURT:  You may.

23                      CROSS-EXAMINATION

24   BY MR. BARTLETT:

25   **Q**    I'm back, Ms. Butler.  You can hear me okay?

1    **A**    Yes.

2    **Q**    We took your deposition a few months ago, and I think

3    you testified that through July 31st of 2021, which is about

4    two months prior to your deposition, you billed Walmart

5    about one hundred nineteen thousand dollars; is that

6    correct?

7    **A**    Yes.

8    **Q**    From July 31st, 2021 through today, how much

9    additional time have you or anyone at your firm billed

10    Walmart?

11    **A**    I don't think we have really done anything subsequent

12    to that other than I guess the preparation I had for the

13    deposition, the deposition, and then yesterday I met just to

14    prepare for today.

15    **Q**    Did you do all that for free?

16    **A**    No.  No.  I certainly didn't mean to indicate it was

17    for free.

18    **Q**    My question, ma'am, was how much have you billed

19    Walmart, how much have you charged them since July 31st of

20    2021?

21    **A**    I don't have an exact calculation.  So, if I try to

22    estimate the hours, I don't know, maybe another ten,

23    fifteen, between the preparing for the deposition, the

24    deposition, and preparing for today.

25    **Q**    Okay.  So your deposition lasted eight hours, and

1    so -- a little bit over eight hours, I think, in terms of

2    from the beginning to the end.  So are you saying you only

3    spent about two hours preparing for today and preparing for

4    your deposition?

5    **A**    No.  I guess it was probably another eight or ten

6    hours.

7    **Q**    Have you billed Walmart since July 31st of 2021?

8    **A**    I guess they're probably billed for the deposition

9    time, yes.

10   **Q**    How much was that bill?

11   **A**    I don't have an exact number.

12   **Q**    Do you have access to that?

13   **A**    Not at the moment, but certainly I can get it, yeah.

14   **Q**    Okay.  Great.  We might ask you -- in fact, we will

15   ask you to get that together, please, maybe at a break here

16   in a few minutes and just let us know.

17   A       Sure.

18   **Q**    Thanks.  Ms. Butler, it's true, isn't it, the people

19   that you surveyed were not limited in geography to the State

20   of Alabama; correct?

21   **A**    That is right.

22   **Q**    And it's true that you didn't limit those that you

23   surveyed to people who purchased from an Alabama Walmart

24   store; correct?

25   **A**    That's correct.

**Q**      In fact, you have no idea where those people that you surveyed purchased their shakes, do you?

**A**      They were not asked for a specific store location, no.  So I don't have a geographic address for the stores in which they purchased.

**Q**      You don't even know which state they purchased it in, do you?

**A**      I did not ask the state of purchase, no.

**Q**      Prior to your issuing a report, did you review the operative complaint in this matter which would be the second amended complaint?

**A**      I don't recall the exact time, I know I have certainly looked at that document.

**Q**      I think you listed it as one of your reliance materials in your report; correct?

**A**      If I did, then, yes, I looked at the second amended complaint.

**Q**      So you looked at the second amended complaint prior to you issuing the report which is dated August 3rd of 2021; correct?

**A**      Okay.  Yes.

**Q**      And at your deposition do you recall me asking you about the claims made by Ms. Morris and whether she was making a claim on behalf of the entire nation and/or just people within Alabama?

1  **A**      I don't recall a specific question, no.

2  **Q**      Well, isn't it true that you actually said at

3  deposition that you thought that the claim was the same for

4  people regardless of geography within the United States?

5  **A**      Yes.  I mean, again, I think my understanding is that

6  the label doesn't differ whether the product was sold in

7  Alabama versus any other state.

8  **Q**      Ms. Butler, my questions are very specific.  If you

9  would please just answer the question.  If you want to

10  follow up with Mr. Gresham on redirect, I think you can do

11  that.

12          The question I asked was, at deposition did you

13  not testify that when you reviewed and designed your survey,

14  it was your understanding that Ms. Morris' claim was that

15  the claim she's making are on behalf of anyone regardless of

16  geography within the United States?

17  **A**      If that's what I said in my deposition, then

18  certainly that's what I said.

19  **Q**      Okay.  You changed your testimony today, didn't you?

20  **A**      Sorry.  Again, I'm not understanding the distinction

21  you are making.

22  **Q**      Mr. Gresham, in asking you, he indicated that you

23  understood that based upon the second amended complaint that

24  Ms. Morris was bringing a nationwide class action with a

25  subset of an Alabama class action, you didn't know that at

1   the time you issued your report or gave your deposition, did

2   you?

3   **A**      I think I indicated I understood that there was a

4   nationwide class, which is why we surveyed across the U.S.

5   **Q**      Actually, you testified just a few minutes ago in

6   court under oath that you understood that there was a

7   nationwide class and a subset of an Alabama class.

8   **A**      Certainly -- sorry.  Certainly I understand that now,

9   I think in some of the papers I reviewed, my understanding

10  is now it's limited to an Alabama class.

11  **Q**      Ms. Butler, we're talking around each other.  I'm

12  talking about in your report dated August 3rd of 2021 and

13  your subsequent deposition, in that deposition, you

14  indicated that you understood Ms. Morris' claim from her

15  operative complaint, which was the second amended class

16  action complaint, which is on your reliance list, that you

17  understood Ms. Morris' claim to be on behalf of people

18  regardless of their geography within the United States;

19  correct?

20  **A**      And I believe, again, certainly if that's what I

21  testified in my deposition, then at the moment or I

22  understood there was a nationwide class being alleged.

23  **Q**      You didn't limit -- at your deposition you didn't

24  mention at all that there was an Alabama subclass, did you?

25  In fact, you didn't even know there was one at that point in

1  time.

2  A      I may not have been aware of a specific Alabama

3  subclass at the time, no.

4  Q      But today you have changed that testimony and you say

5  you are now aware of it; correct?

6  A      That's correct.  I understand that now.

7  Q      Okay.  But you haven't changed your survey, you

8  haven't redone the survey, you haven't gone out to a new set

9  of people just from Alabama, you're still relying on the

10  original survey that purportedly seeks to gain information

11  from people regardless of geography within the United

12  States; correct?

13  A      I certainly wasn't asked to redo the survey.  And as

14  I think I indicated, I don't have reason to believe that

15  there is a geographic correlation between purchasing

16  motivation and the products at issue here.

17  Q      Thank you for that.

18         Ms. Butler, in your survey here in the Morris

19  case, did you ever show your purported purchasers of the

20  shakes any pictures or advertising or labels of the shakes?

21  A      No.

22  Q      Did you show them a picture of the unclean label?

23  A      By "unclean label" you mean the label prior to 2018?

24  No.  The respondents aren't shown pictures of the label.

25  Q      Ever.  You have never shown any of your respondents a

1    picture of any label, regardless of whether it was the

2    unclean label or the clean label; correct?

3    **A**    I indicated this isn't a reading test of the label.

4    So no, they weren't -- respondents weren't shown pictures of

5    the label.

6    **Q**    So, in responding to your survey, they had to base

7    their responses on recall; correct?

8    **A**    So, there is an unaided or open-ended recall question

9    as well as an aided recall question.  So they are provided

10   with a list of factors in the closed-ended question, which

11   has this -- the label statement as part of that list.

12   **Q**    Okay.  Let's be clear about the list.  How many items

13   are on your list?

14   **A**    I believe there are eighteen and then there are --

15   there's a -- other response as well as a don't know, don't

16   recall.

17   **Q**    The two claims at issue here, those are two of your

18   list of eighteen or so, nineteen, rather; correct?

19   **A**    Yes.  And actually, I should say there is also an

20   answer for none of these as well as don't know and other.

21   And the two label statements are part of that list.

22   **Q**    Two out of twenty are the correct answer?

23   **A**    Two out of twenty-one.

24   **Q**    Twenty-one.  Okay.  So two out of twenty-one.  Less

25   than ten percent.

1      So we're looking at -- and remind us when you

2  conducted the survey, what date.

3  **A**      It was July, I believe it was -- July 2nd, 2021.

4  **Q**      You testified a few minutes ago that your survey

5  asked questions about the first time that one of your

6  respondents made a purchase as well as a subsequent

7  purchase, or maybe it was a most recent purchase.  So, it

8  could have been that some of your respondents made their

9  first purchase in February or March of 2018 which was -- is

10  that two-and-a-half years prior to your survey?

11  **A**      So there are respondents who certainly purchased --

12  we have the exact month, but there are respondents who

13  purchased in -- sorry, first purchased in 2018 and

14  subsequently.

15  **Q**      Do you have any first purchased in February of 2018?

16  **A**      I'm sorry?

17  **Q**      Do you have any respondents that first purchased in

18  February of 2018?

19  **A**      I would have to look back at the data to see the

20  exact months, but I may.

21  **Q**      Did you ask about the day of purchase or just the

22  month?

23  **A**      Just the month.  Month and year.

24  **Q**      Okay.  So I'm going to keep a list of things so we

25  can keep moving.  There are two things now that I would like

1    you to do maybe at a break, one is the invoices, and then

2    the other is look at your data, I assume you're talking

3    about the two large spreadsheets that you need to look at to

4    determine the earliest date?

5            MR. GRESHAM:  Your Honor, this is discovery

6    requests that haven't been issued.  I mean, he's perfectly

7    capable of asking her about her memory.  But in terms of

8    producing her records, I don't think there is any need for

9    her to go dig up and produce those.

10           THE COURT:  I'm going to overrule that objection.

11   I think he's asked her a question and she said she doesn't

12   remember the answer and that she has that at her --

13   virtually at her fingertips, so I don't think there is any

14   reason why we couldn't ask her to do that if we have a

15   minute to do it.

16   **Q**    (By Mr. Bartlett)  Ms. Butler, talking about the

17   survey design.  You had a series of screening questions,

18   right, that you developed or that you believe helped you

19   understand whether the respondent was in fact an actual

20   purchaser of the clean label shake; right?

21   **A**    That's correct.

22   **Q**    Okay.  Tell me a little bit about that screening

23   question and how did you develop it.

24   **A**    So, there are multiple questions, it's not just one

25   question.  There are questions that first provide

1    respondents with a list of product types or items, so

2    unrelated to a particular brand.

3          So the first question is which of these products,

4    if any, have you purchased since 2018.  Any respondent who

5    is not selecting a particular type of product is not

6    qualified for subsequent questions.

7          The next question asked about, okay, you stated

8    you purchased pediatric shakes, which of these brands, if

9    any, have you purchased.  And I think there were a list of

10    ten or fifteen possible brands.  So respondent had to select

11    the particular brand.

12          Then respondents had to -- so you picked a

13    particular brand, now you have to pick a particular flavor.

14    My understanding strawberry was not at issue here.

15          So, using those questions, which again they

16    randomized, they have other distractor or irrelevant items,

17    that's the process by which then we identified actual

18    purchasers.

19    Q    Okay.  Can you tell the court, please, how you listed

20    the pediatric shake at issue in this litigation on your

21    screening question?  Like the name of it and give me the

22    exact name of it, please.

23    A    It is listed as Parent's Choice and then in the

24    parenthetical Walmart.

25    Q    Okay.  Did you ever ask any of your respondents

1  whether they purchased an unclean or a clean label shake as

2  part of your screening question?

3  **A**    I'm not sure that would have been meaningful to

4  respondent, so no.

5  **Q**    It wouldn't have been meaningful because, first off,

6  you didn't do it; right?

7  **A**    Well, no.  I mean, I think it would have been

8  meaningful, I don't remember that respondents themselves

9  would understand what clean or unclean label meant.

10  **Q**    Did you differentiate in any way Walmart's pediatric

11  shake that did not contain the claims at issue here versus

12  those that did contain the claims at issue here?

13        How did you determine whether your respondent

14  purchased an unclean label shake or a clean label shake?

15  **A**    Well, we have respondent -- so, certainly to qualify

16  for the survey, every respondent had to have made a purchase

17  post 2018.  We have --

18  **Q**    Let me stop you.  Post 2018, which date?

19  **A**    To qualify for the survey, respondents had to

20  indicate that they had purchased a shake after 2018.

21  **Q**    So that would have been January, February, March

22  through the end of 2018?

23  **A**    Oh, no.  Sorry.  Outside of 2018.  So we have -- I'm

24  sorry.  Let me get to the table.

25  **Q**    Ms. Butler, now I'm confused.  Are you saying -- we

1    had this discussion at your deposition about what post 2018

2    means.  And to you, I think at your deposition, it meant the

3    year 2018, January 1 of 2018, to present.

4    A      That's right.  And I'm sorry if I created confusion.

5    So, as I look at Table 3 of my report, the most recent

6    purchase, that indicates that we have about sixty-three

7    percent who made their most recent purchase in 2021, and

8    then scaling back to that.  So there is about thirteen

9    percent of the respondents, of the four hundred two

10   respondents, who have their most recent purchase in 2018.

11   And it could have been any month in 2018.

12   Q      Okay.  And so it could have actually been before

13   Walmart even shipped the clean label shakes; right?

14   A      So my understanding is that you discussed the

15   February date, so if there was a January purchaser in the

16   2018, that thirteen percent, there may be an individual in

17   that thirteen percent.

18          The majority of respondents certainly purchased in

19   2021, sixty-three percent.

20   Q      But you're admitting to the court here today that you

21   actually, some of these "verified" screened respondents may

22   have actually purchased an unclean label shake, meaning a

23   shake that doesn't even have the claims at issue here;

24   right?

25   A      No.  I don't know that any actual respondent had

1    purchased in January of 2018.

2    **Q**      What did you do to check to make sure that nobody had

3    purchased prior to these shakes -- clean label shakes

4    actually being shipped and actually being placed on the

5    shelves in a Walmart store in Alabama?

6    **A**      I don't know the -- I don't know that anybody

7    provided me with the date at which the products were placed

8    on the shelf.  But certainly the majority of respondents,

9    that is, over eighty, eighty-seven percent of respondents

10    purchased in years 2019 through 2021.  With the vast

11    majority of those respondents being purchasers in 2021.  So

12    the most recent year.

13    **Q**      Did Walmart sell the unclean label shakes after it

14    began shipping to Walmart stores in Alabama the clean label

15    shake?

16    **A**      In terms of Alabama, I don't know the exact

17    distribution of Alabama.  But again, if we look at the

18    responses we have in the survey, which was conducted in

19    July, the vast majority of respondents had purchased in the,

20    I guess, seven months, July 2nd, so the seven months, first

21    seven months of 2021.

22    **Q**      Ms. Butler, I don't think you answered my question.

23          What did you do in designing your survey and

24    creating your report and in testifying here today on behalf

25    of Walmart to determine that those respondents that you

1    surveyed did not purchase an unclean label shake that was

2    still on the shelf in Alabama and somehow got through your

3    screening questions and answered these particular respondent

4    questions?

5    **A**      Well, I think, in part, we actually do have, and it

6    seems like a relevant data point, that we have many

7    purchasers who, in fact, did purchase the product when the

8    label was unclean.  So we have purchasers who both purchased

9    at both points in time.  So those are not excluded from the

10   survey.

11   **Q**      Let me make sure I understand what you're saying.

12              You're saying that you can ask someone who did not

13   purchase a clean label shake whether they relied upon the

14   claims at issue here in this litigation to purchase the

15   clean label shake?

16              What is the point of having -- what is the point

17   of including respondents that purchased an unclean label

18   shake in your survey?

19   **A**      Maybe we're not understanding each other.  But I

20   think that if you look at -- look at Table 4, what we see is

21   that there are a number of respondents who have purchased

22   recently, but also purchased these products when the label

23   claims at issue were not existing on the products.

24   **Q**      I agree with you on that.  But those people also

25   claim, they are unverified, but they also claim that they

1  purchased a clean label shake; right?  At least that's what
2  your report says.
3  A    Respondents themselves aren't identifying a clean or
4  unclean label shake.  We certainly look at the time period
5  at which a respondent purchased the shake.  So we have
6  respondents who purchased 2019, 2020, 2021 who may have also
7  purchased the product prior to the label at issue here.  And
8  that seems to be a relevant data point because it certainly
9  indicates that there are purchases being made and motivated
10  by things that are not related to the label claims at issue.
11  Q    Just so I'm clear.  You're talking -- you're making
12  the distinction between a label at issue and you're using
13  January 1, 2018 as that date at which the label at issue
14  came into play; right?
15  A    To qualify for the survey, a respondent had to have
16  made a recent purchase post January 1, 2018.
17  Q    Do you agree with me that, according to Walmart's
18  records, it is impossible for someone to have purchased a
19  shake with a label at issue in this case prior to -- towards
20  the end of February of 2018?
21  A    It's my understanding that the products were shipped
22  in February 2018, yeah.
23  Q    Did you consider any data from Walmart when you
24  designed your shake and you set up the -- I mean, when you
25  designed your survey about the shakes?

1    **A**      So, I didn't -- I'm not sure what you mean by

2    consider.  But no.  So I did not rely on -- I think we

3    discussed this certainly at my deposition -- the Walmart.com

4    shopper list.

5    **Q**      You didn't look to -- you didn't look at the name of

6    any of the people, you didn't look at the age of any of the

7    people, you didn't look at the gender, you didn't look at

8    the geography, you didn't know anything about any of the

9    actual Walmart purchasers, did you?

10   **A**      I think, as I stated, my understanding is that that

11   list is a certain subset of individuals with Walmart.com

12   accounts and, therefore, is not representative of the total

13   population of possible purchasers.

14   **Q**      So you're telling this court under oath that you

15   believe that an internet survey, it's a convenience sample,

16   not a probability sample, is more reliable than a survey

17   conducted on known verified purchasers of the product at

18   issue?

19   **A**      I'm -- there are a number of (inaudible) the list

20   sample that you're describing is a less appropriate means by

21   which to reach out to the entire possible relevant

22   population.  And so, yes, given the limitation and potential

23   biases of a list sample, the more appropriate approach here

24   is to use the type of panel that I have used here.

25   **Q**      You just used the word, you said that you thought

1    that your survey reached out to the entire population,

2    potential relevant purchasers; correct?

3    **A**    Certainly the -- in terms of correlation with

4    characteristics, yes.  The internet panel represent, again,

5    because these panels are constructed to reflect the

6    characteristics of the U.S. population, and those, unlike a

7    list sample, which again is correlated with some of the

8    things we're trying to measure here, the internet panel

9    represents a more reliable way to try to reach out to all of

10   the different characteristics of this potential population.

11   **Q**    I think we just agree to disagree on that.

12         But again, the word you used a minute ago was, I

13   think, the entire possible relevant population; correct?

14   **A**    Yeah.  I guess so.

15   **Q**    Did your survey take into consideration or have

16   respondents that don't have access to the internet?

17   **A**    No.  So -- well -- so -- sorry.

18   **Q**    Ms. Butler, my question was, did your survey take

19   into consideration those persons that purchased the shakes

20   that do not have internet access.  And that's a yes or no

21   question.

22   A    Sure.  Just to be clear, though, the survey is also

23   available and it's shown in my exhibits on a cell phone.  So

24   to the extent that someone has access via a cell phone, I

25   just want to clarify, we're not talking about internet

1  access through a computer only.

2  **Q**    Thank you, Ms. Butler.  I didn't say computer, I

3  didn't say cell phone.  I said internet access.

4         In fact, you knew where this question was going

5  because I asked you this exact question at your deposition,

6  didn't I?

7  **A**    Yes.

8  **Q**    Do you know anything, regardless of whether you got

9  the information from Walmart or some other source, about the

10  age, the sex, or the geographic location of purchasers of

11  the clean label Walmart shakes?  Actual verified purchasers.

12  Not your respondents, but actual verified purchasers.

13  **A**    Well, again, I think we have actual purchasers in the

14  survey.  But if you mean some list outside of a Walmart.com

15  account, which would also require some kind of internet

16  access, I think, as I indicated, we don't have the

17  possibility here of doing some kind of probability sample

18  because there is no existing list of every single purchaser

19  of these products.

20  **Q**    I want to hit on the probability sample thing.  Is it

21  your testimony that for a probability sample you have to

22  have a list of every single purchaser -- every single known

23  purchaser of the shakes?  Is that your testimony?

24  **A**    If you're talking about a probability sample that

25  represents the entire population, yes.  A probability sample

1    has the ability to have a -- some kind of list of every

2    element of the population that would allow you to draw from

3    that list with a non-zero known probability of selection.

4    **Q**    Could you -- I mean, I assume, you could have done a

5    probability sample on the known purchasers, which Walmart

6    produced a list in Alabama of the known purchasers of about

7    fifty-two thousand four hundred shakes, you could have done

8    a probability sample on them; right?  But you didn't.

9    **A**    Well, again, that would be a subset of total

10   purchasers because that is a list comprised of individuals

11   who have a Walmart.com account which is not representative

12   of the total population.

13   **Q**    So how is your list of people that voluntarily

14   reached out to a survey company and opted in for

15   compensation purposes a better list of people than Walmart's

16   known verified purchasers?

17   **A**    Sure.  Just one point of clarification.  Not all of

18   the respondents in the panel are individuals that reach out

19   to the survey company.  In fact, one of the ways in which

20   these companies create reliable and robust panels is they in

21   fact solicit participation and make sure that the

22   participants are a balanced representation of the U.S.

23   population.

24          So, in terms of sampling, to kind of draw the

25   distinction or balance the options we have here, we have a

1  list that is correlated with the particular brand and

2  company that is at issue and part of this litigation, so the

3  characteristics of individuals who have Walmart.com accounts

4  may be very different in their purchasing behavior than of

5  randomly drawn population from a pool of individuals who are

6  not correlated to the particular store.  So you could

7  imagine many reasons that, for example, had I only sampled

8  from Walmart.com purchasers, those would be individuals who

9  say, I love the brand, I buy it all the time, that's the

10  only reason I buy it, I always shop at Walmart -- there's a

11  possible correlation there between what we're trying to

12  measure and the limitations of the list.

13          Given that potential for bias, it is better to go

14  to a population base sample that reflects the

15  characteristics of the U.S. population, send out a random

16  selection of emails, and draw people into the survey

17  randomly so that we don't have the correlation between the

18  population that we sampled and what we're trying to measure.

19  **Q**    Ms. Butler, are you changing your testimony from your

20  deposition which you testified that the respondents had to

21  opt in to participate in this type of survey?

22  **A**    Well, respondents have to opt in to be a part of the

23  panel.  But they don't all -- I think, as you indicated,

24  they don't reach out to the survey company.  I mean, so,

25  certainly no one is forced to be a part of this panel.  And

1    to that extent they are certainly opting in to agree to

2    participate in research.

3            But it's not as though everybody on the panel

4    sends an email or calls a panel company or says they want to

5    participate.  There's outreach done in the other direction.

6    **Q**    Did you calculate a margin of error in your survey or

7    in results?

8    **A**    No.  I think I explained why that's not appropriate.

9    **Q**    But you didn't calculate a margin of error; right?

10   **A**    It would have been mathematically inappropriate and

11   it would have been -- not the correct thing to do.

12   **Q**    We talked a little bit in your deposition about kind

13   of the claims made by the plaintiff here.

14           Do you recall believing that one of Ms. Morris'

15   claims was that the shakes contained one hundred percent

16   natural ingredients?

17   **A**    I think you asked me about that at my deposition,

18   yes.

19   **Q**    Do you recall that that was your understanding that

20   that was one of her claims?

21   **A**    My understanding, yes, at the deposition, I think I

22   indicated that the question that was asked distinguishes one

23   hundred percent natural from natural and synthetic.

24   **Q**    Say that last part one more time.

25   A    Sure.  So, I think you had asked me at my deposition

1    and we looked at the question of, I think it's question

2    nine, and the question distinguishes one hundred percent

3    natural ingredients and then also gives respondents an

4    option for some actual and some synthetic ingredients and

5    then they don't know a response.

6    **Q**    Right.  But my question was, at the time of your

7    deposition, didn't you agree with me at that deposition that

8    your understanding of one of Ms. Morris' claims was that she

9    said that Walmart believed or that Walmart labeled this as

10    one hundred percent natural?

11    **A**    I'm sorry.  Can you repeat the question?  Did I agree

12    with you in the deposition that that was what plaintiff had

13    said?

14    **Q**    Right.  What Ms. Morris had said.

15    A    I may have indicated that.  Certainly that's the way

16    the question is structured so that there's a distinction

17    between one hundred percent natural ingredients, some

18    natural and some synthetic ingredients.

19    **Q**    Ms. Morris, at least you know today, you didn't know

20    at the time of your report or your deposition, you know

21    today Ms. Morris is not making a claim that Walmart asserts

22    that these shakes are alleged to be one hundred percent

23    natural; right?

24    **A**    That's correct.

25    **Q**    But your survey asked respondents about that;

103

1    correct?

2    **A**      There is a question in the survey that asked people

3    whether their belief is that the product contained one

4    hundred percent natural ingredients or some natural and some

5    synthetic ingredient.

6    **Q**      Would you agree with me, Ms. Butler, that purchasers

7    of consumer products, let's talk about the shakes here.

8    Would you agree with me that purchasers of consumer

9    products, the shakes here at issue in this litigation, the

10   reason for those purchases can change over time?

11   **A**      Sure.

12   **Q**      And it's true that your survey only asked about the

13   very first purchase which we all, we just discussed, could

14   have been an unclean label purchase and the most recent

15   purchase; right?

16   **A**      Yes.  The survey asked for first purchase and most

17   recent purchase.

18   **Q**      So, you didn't ask anything and you don't have any

19   data, you know nothing about purchases in between -- like

20   Ms. Morris purchased these shakes on numerous occasions, but

21   those people that allegedly were purchasers of the shakes

22   that responded to your survey, you don't know anything about

23   their purchases between the first purchase and the most

24   recent purchase; right?

25   **A**      The survey respondents, like Ms. Morris, bought or a

1    number of them bought the product prior to the clean label

2    and also bought the products after or during the clean

3    label, and so it's not a question or a survey that asked

4    about every single purchase, but we certainly evaluate

5    variability across first and most recent purchase.

6    **Q**    Thanks.  Again, just to be clear, you didn't ask

7    anything about the middle purchases, the purchase between

8    the first purchase, which could have been an unclean label,

9    your survey doesn't know, and then it could have been -- in

10    fact, the most recent -- let me start that over, Ms. Butler,

11    I apologize.

12        It's entirely possible that the most recent

13    purchase of your respondents could be an unclean label;

14    right?

15    **A**    So, I think, again, if we're talking about whether or

16    not there is any respondent in the survey that purchased in

17    January -- first purchased January 2018, it's possible.  But

18    again, the vast majority, eighty-seven percent of

19    respondents made that purchase in years 2019 or later.

20    **Q**    What about February of 2018, purchaser could have

21    purchased an unclean label then; right?

22    **A**    Depending on when the products are shipped.  If we

23    want to include January and February.  Again, that certainly

24    doesn't change the eighty-seven percent of respondents being

25    in years 2019 or later.

1  **Q**      Thank you.  Ms. Butler, if you could -- promise,

2  we'll get by a lot quicker if you just answer my question.

3  Mr. Gresham can ask any follow-up questions.

4          How about March of 2018, could some of your

5  respondents purchase an unclean label, either first

6  purchased or most recent purchase an unclean label in March

7  of 2018?

8  **A**      Again, there's no prohibition in the survey as to

9  March 2018.  So, if there is a respondent who purchased in

10  March 2018, that's possible.

11  **Q**      How about April of 2018, same question.

12  A      Well, again, I don't know that -- I haven't seen any

13  data as to when the products were actually placed on

14  shelves.  My understanding is that they were distributed or

15  shipped for distribution in February.  I guess we would hope

16  by April the products are on the shelves.

17  **Q**      You believe by April of 2018 Walmart was only selling

18  clean label shakes?

19  **A**      I don't have any data to indicate the extent to which

20  the product turn over, let's say, on any given store was the

21  particular label.  Certainly again --

22  **Q**      You didn't --

23  **A**      I was going to say, certainly again, what I can say

24  is the vast majority of respondents, eighty-seven percent or

25  more, bought outside of 2018, so 2019 or later.

1    **Q**       Should we only look at your data from 2019 or later?

2    **A**       Certainly if you wanted to limit the data to do that,

3    you certainly could.  You would have certainly a sufficient

4    sample to do so.  Because that would only reduce the survey

5    by a very small proportion.

6    **Q**       Prior to today and me asking you these questions, had

7    you ever considered this issue of the unclean label shake

8    being sold after February 28th or 29th, whether it was a

9    leap year or not, 2018?

10   **A**       So, I have not limited the data in that way.  The

11   data are available if we need to do that.

12   **Q**       Did your survey in any way ask your respondents

13   whether they were misled, deceived, or confused or even ask

14   them to explain the meaning of anything on the shakes label?

15   **A**       It's not a deception survey.  It wasn't designed to

16   understand how people interpret particular label claims.

17   Again, that's why we weren't showing them the label.  So no,

18   I didn't ask people if they were misled.

19   **Q**       Apart from your screening questions, what did you do

20   to independently verify that each of your respondents

21   actually purchased a clean label shake?

22   **A**       Again, we have the screening questions that are

23   designed using standard practice --

24   **Q**       Ms. Butler, I said, I started the question with,

25   apart from the screening questions, what did you do.

1    A       Sorry.  You dropped for a second.  I thought you said

2    the screening question.

3            Apart from the screening questions, we're not

4    asking respondents to show us a picture or produce a

5    receipt.  Again, for a product like these, we wouldn't

6    assume that individuals would have some kind of written

7    evidence that they purchased the product.

8    Q       Did you analyze your survey data in any way to

9    identify a single reason as to why a respondent claimed to

10   have purchased the clean label shakes?

11   A       No.  The respondents aren't asked to identify a

12   single reason.  Certainly in their open-ended question, if

13   they felt like there was only one reason, or even in the

14   close-ended question, if they selected only a single reason,

15   they could certainly do so.

16   Q       But you didn't analyze your survey data, that was my

17   question.  I didn't ask whether you asked.  I said, did you

18   analyze the survey data.

19   A       Well, I guess in terms of analyzing the survey data,

20   certainly we present the frequency of responses, but it's

21   not by single response.  So no.

22   Q       In fact, you don't believe that is valuable

23   information at all for this case, do you?

24   A       Well, the single response -- no.  I mean, I think my

25   understanding, and I think we discussed this at my

1    deposition, is it -- it hasn't been claimed that natural

2    flavoring is the only reason an individual purchased the

3    product and, therefore, only individuals who said that was

4    the singular reason for their purchase are at issue here.

5    **Q**    There is more than one claim here, there is natural

6    flavor and there is also the other one.  Let's don't forget

7    about that.

8           Going back to my question.  I think you maybe

9    answered it, but I want to be very clear.

10          Did you do anything in your report or in your

11   survey to analyze the survey data to identify a single

12   reason as to why one of your respondents claimed to have

13   purchased the shakes?

14   **A**    No, I did not identify a single reason, given my

15   understanding that there is not a claim that natural

16   flavoring or the other claim, the no sweeteners, no

17   artificial sweeteners, is the singular reason individuals

18   purchased the product.

19   **Q**    Okay.  And you do not think that that information is

20   valuable; correct?

21   **A**    So, given my understanding that it is not a claim

22   that natural flavoring or no artificial sweetener is the

23   single reason that caused purchasers to purchase the

24   product.  Analysis allows for respondents to have other

25   reasons for purchasing as well as those reasons.

**Q**      I still don't know -- I'm asking you a specific question.  Do you think it is valuable or not?  Yes or no.

A        Well, I guess it sounds like perhaps a legal question, so certainly if somebody wants to go into the data and identify a set of respondents who selected only natural flavoring or only no sweeteners, one could.

But given my understanding that plaintiff isn't claiming those are the only reasons for purchase, no, it doesn't seem particularly valuable to me.

**Q**      That's consistent with what you said in your deposition.  You said, I'm not sure why that's particularly valuable, so no; correct?

**A**      Yes.

**Q**      Did you do anything to weigh the respondents' choices for their claimed reasons for purchasing the clean label shakes?

**A**      No.  So, there is not a point allocation or a weighting.  Again, it wasn't my understanding that the natural flavoring or the no artificial sweeteners had to be some level of importance.  It's not that they had to be thirty percent of the purchase reason or twenty percent.

So no, there is no weighting of the responses.

**Q**      At the time of your deposition, had you ever held one of these shakes, whether it's the unclean or the clean label, in your hands?

**A**      No.

**Q**      Did you ever look at any Walmart documents relating to advertising?

**A**      Certainly I looked at the product images and the information online.  But if there are other legal documents that were produced that aren't part of the things on my Exhibit B, no.

**Q**      Did you ever go to a Walmart store and look at how they are presented on the shelf?

**A**      No.  So, it wasn't a test of particular advertising and we weren't showing the product in stores, so no.

**Q**      You never actually spoke or communicated in any way with a clean label shake customer that had some sort of written proof that they purchased one of these shakes; right?

**A**      So, I did not reach out personally to any survey respondent or individual who had some written proof, no.

**Q**      Do you believe that Ms. Morris claims the shakes do not contain any synthetic materials?

**A**      I think maybe you had asked me this at deposition, so I think the -- my understanding now is that the claim is associated with the flavoring, it's not a claim that she's making.

**Q**      Your answer has changed since your deposition, hasn't it?

**A**      I think you already discussed or we already discussed here, when we were discussing the question in the survey, the distinction that the survey makes is one hundred percent natural versus natural or some natural and synthetic.

**Q**      The question I asked on Page 53, Line 17 of your deposition:  Thank you.  Do you believe that the plaintiff here claimed that the shakes do not contain any synthetic materials?

Answer:  I have to go back and look at the deposition.  Certainly, I understand as part of the complaint plaintiff has claimed that the -- that the advertising or the labeling of the product as being naturally flavored in containing no synthetic additives is misleading and does not appropriately represent the product.

That's what you said at your deposition; right?

**A**      Yes.

**Q**      And you since changed that answer that I just -- the answer I asked you here in court, your answer is different than it was in deposition; right?

**A**      Yes, I think that's correct.  My understanding is that -- I think, as you raised further on in the deposition, that it has -- at deposition I indicated I didn't recall her exact deposition testimony.  I think you went on in the deposition to point out that the claim is related to or that's not what the named plaintiff suggested.

**Q**     Certainly at the time of your deposition and necessarily before that when you issued your report that was your understanding of the claim; right?

**A**     Sure.  And I think the survey question is structured to distinguish between one hundred percent natural and some synthetic and some natural.  It's a separate question from the questions about why individuals purchased.

**Q**     Prior to your deposition, did you ever look at the label of the shake, the unclean label of the shake, meaning the one that didn't have the claims at issue here?

**A**     I believe it was part of named plaintiff deposition exhibit, yes.

**Q**     At your deposition, question:  Did you look at the label of the shake prior to February of 2018?

        Answer:  I don't believe I saw the specific labels, no.

        Are you changing your answer here today?

**A**     No.  I think, as the testimony goes on, I think I indicated that I believed that maybe it was part of the deposition exhibit for named plaintiff.

**Q**     Let's read on.

        Question:  Did you ever see a picture of that shake?

        Answer:  No, not that I recall.

        I'm on Page 68 of your deposition, Line 3.

1          Answer:  No, not that I recall.  I may have -- I

2    had discussions with counsel about the label, but I don't

3    recall, and maybe it was shown, but I don't recall seeing a

4    specific picture.

5          Ms. Butler, how many people actually started your

6    survey?

7    **A**     Sure.  Because the survey is sent out to a random

8    population of representative of the U.S. population,

9    eighteen years and older, the survey was sent out to sixteen

10   thousand, I believe, six hundred forty-two respondents --

11   I'm sorry -- sixteen thousand eight hundred fifty-two

12   potential respondents.

13   **Q**     Ms. Butler, please listen to my question carefully.

14         How many people actually started your survey?

15   **A**     I apologize.  I don't have a count of how many people

16   actually started the survey.

17   **Q**     So it's true that a little more than sixteen thousand

18   people received an invitation to start your survey; correct?

19   **A**     That's correct.

20   **Q**     But you don't know and you didn't produce any

21   information for any of us here, the court, the parties, to

22   understand how many people actually started that survey;

23   right?

24   **A**     Sure.  And I think, as we discussed in my deposition,

25   what I need to know is if the survey has gone out to a

1    potential pool of respondents that reflects the U.S.

2    population and, of course, not everybody qualifies for the

3    survey.

4            So what I care about is that the survey gets sent

5    out to a representative population and that a substantial or

6    sufficient number of respondents actually qualify.

7    **Q**    It's also true that you have no data, you didn't

8    produce it to anybody, the court, nor have you testified

9    about it, that shows how many people were ultimately

10   excluded by your, what did you call them, your questions,

11   your screening questions; right?

12   **A**    That's correct.  And again, if somebody is not

13   qualified to take the survey on the basis of their screening

14   responses, they're not relevant for this particular survey.

15   **Q**    Are you still a member of the ASA, the American

16   Statistical Society?

17   **A**    American Statistical Association, yes.

18   **Q**    Since your deposition have you had a chance to go out

19   there and look at the ethical guidelines?  Do you remember

20   we discussed those at your deposition?

21   **A**    No.  I know you raised them or I think you had them

22   as an exhibit at my deposition, but I haven't gone back to

23   review them.

24   **Q**    Have you done anything to learn what those guidelines

25   and requirements are?  You didn't know them at your

1   deposition.  Do you know them today?

2   **A**      Well, I think I indicated in my deposition that I

3   didn't have that document memorized word for word.  I have

4   been a member of the ASA, the American Association for

5   Public Opinion Research, I certainly know what and adhere to

6   good research practices.

7   **Q**      Did you produce any data or get any information on

8   your respondents to know how many paid surveys those

9   particular respondents have participated in, say, the last

10  year?

11  **A**      I don't have a count of participation in the last

12  year as one of our quality control questions.  I exclude any

13  respondents who has taken the survey, I think it's in the

14  last three months, on a topic that's related to the topic of

15  the survey that I am interested in to ensure that there's

16  not some kind of bleed over from some other questions into

17  the survey that we have conducted.

18  **Q**      You asked these paid compensated people that

19  question; right?  You didn't do anything independent to

20  verify whether that answer is true or not; correct?

21  **A**      So, standard practices that research participants are

22  compensated for their time.  Again, the way in which

23  screening questions are structured, no respondent knows what

24  answer I am particularly seeking.  Even a question like

25  here's a list of survey topics in the last three months,

1  which of these, if any, have you participated in.

2          So, I certainly don't believe an entire research

3  industry is built on people who are lying in surveys.  And

4  again, we have a whole set of screening questions to ensure

5  that qualified actual participants take part in the survey.

6  **Q**     Ms. Butler, what was my question?

7  **A**     You asked whether or not compensated respondents was

8  verified in some way, other than the question asked, that

9  they had not participated in the survey on a related topic.

10 **Q**     You said that the respondents were paid in points;

11 right?  Which they could then later combine with other

12 points from other surveys to get some sort of credit of some

13 sort to something; right?

14 **A**     Generally speaking, that's correct.  Yes.

15 **Q**     Those people are only paid if they successfully get

16 to the end of the survey?

17 **A**     For this particular survey, we were paying

18 respondents on qualified completes, yes.

19 **Q**     If they didn't get your trap questions, your

20 screening questions, which required certain specific answers

21 to proceed, then they weren't going to get those points to

22 get paid; right?

23 **A**     They receive an indication that says thank you,

24 you're not qualified for this survey.  So yes, they are not

25 compensated because they're not qualified.

**Q**     Do you have any contact information on the respondents from your survey?

**A**     No.  That would violate certainly what respondents are told about their participation and it also violates the double-line.

**Q**     So the court, me, the plaintiff, Walmart, nobody has any way to go out and figure out who these people are and talk to them about their responses to verify them; right?

**A**     I think you asked me about this, yes, in deposition and certainly it is -- there is not a personal identification tied to each of these survey respondents.

I think if you look at the introduction to the survey instrument itself, you'll see that respondents are promised confidentiality, and that is standard research practice.

**Q**     To be clear, Ms. Butler, is there any way that anyone in this courtroom can go out and contact these people to verify their responses in any way?

**A**     No.  It, again, would violate the agreement with which I promise survey respondents, also the vendor promised the survey respondents, so no, they are promised confidentiality.

**Q**     To this day, even in preparation for this hearing, it's true that you have never cross-referenced your survey respondents' information -- identifying information with a

1  known list of purchasers in the Walmart records; right?

2  **A**     Again, I do not have personal -- personally

3  identifying information for the pool of individuals who

4  participated in my survey.

5        So I don't have that information, so I could not

6  cross-reference it with Walmart's list.

7  **Q**     Since you didn't show any of your respondents the

8  label, a picture of the label or any of the claims that were

9  on the label, it's true that you are relying totally on the

10 respondent's recall; right?

11 **A**     Well, again, there is an open-ended question which is

12 relying on their recall and their characterization.  But

13 they are also provided with a list from which they can

14 select items that were reasons for their purchase.

15 **Q**     Are you, in your conclusion in your report, are you

16 essentially saying that the language at issue in the

17 litigation, the two claims, did not cause people to purchase

18 the product?

19 **A**     For a substantial proportion of respondents or

20 purchasers, the natural flavoring and the no artificial

21 sweetener characterization on the label were not motivation

22 or reasons for their purchase of the product.  So, between

23 sixty-five and seventy percent.

24 **Q**     So why is it on the label?

25 **A**     Well, I'm not Walmart, kind of marketing team, but

1    certainly over twenty years of doing consumer research,

2    there are lots of things that are put on products or put

3    into advertising that don't particularly resonate with

4    consumers, or maybe are important for a small subset but are

5    not important generally.

6    **Q**    Are you saying you know more about the consumer

7    behavior with respect to these shakes than Walmart does?

8    **A**    Well, no.  I am saying that my experience has been

9    that many times advertisers or companies place certain

10   language on products that just aren't that meaningful to the

11   consumer.  And certainly in this context, based on actual

12   research with consumers, it is not a purchase-driver for

13   purchasers of these products.

14             MR. BARTLETT:  Just one second, Ms. Butler.  If I

15   may have one minute.

16             THE WITNESS:  Of course.

17             MR. BARTLETT:  Your Honor, can we have just a few

18   minutes, about five minutes, and I think we are very close

19   to being done.  Is that okay with you?

20             THE COURT:  Are you saying you need a five minute

21   break?

22             MR. BARTLETT:  Would that be okay?

23             THE COURT:  That's fine.  And in the meantime she

24   can pull the two things you asked her to look for if she can

25   put her hands on them.  Yes, we'll take a few minutes for

1    everybody to stretch.

2            MR. BARTLETT:  May I also ask that she not have

3    any communication with Walmart during this break?

4            THE COURT:  I think it would be appropriate for

5    her not to speak with counsel.

6            MR. GRESHAM:  She may need to email me the stuff,

7    whatever it is you find.

8            THE COURT:  Something like that is fine.

9            MR. GRESHAM:  Sarah, just email me whatever it is

10   you find.

11           THE WITNESS:  Counsel, if you could just remind

12   me.  It's an invoice and, I'm sorry, what was the second

13   piece?

14           MR. BARTLETT:  Yes, ma'am.  The question about

15   invoices or charges to Walmart past July 31st, 2021.  And

16   then also -- I guess that's it.  Thank you.  We'll be back

17   in just a few minutes, Your Honor.

18                         (Break taken)

19           THE COURT:  Back on the record.

20   **Q**     (By Mr. Bartlett)  Were you able to get together the

21   invoice or at least some information for us on the amount in

22   addition to the approximately one hundred nineteen thousand

23   you billed as of July 31st, 2021?

24   **A**     I have emailed my admin to try to pull that for me

25   now.  I don't have that.  I'm sorry.

1          MR. BARTLETT:  I guess we'll just get it from

2     Mr. Gresham at some point.  Maybe we can enter that email

3     into the record.

4          MR. GRESHAM:  As soon as I get it, I will get it

5     to you.

6     **Q**     (By Mr. Bartlett)  Do you recall testifying for the

7     plaintiffs in a Whirlpool case back in 2014, maybe Western

8     District of Ohio, before a Judge Boyko?

9     **A**     Yes.

10    **Q**     And you testified on behalf of the plaintiffs there;

11    right?

12    **A**     Yes.

13    **Q**     In that case you were a damages expert; is that

14    right?

15    **A**     No.  So, I did a conjoint type survey to -- that was

16    used by -- the output of that survey was used by a damages

17    expert.

18    **Q**     But you conducted an internet survey in which you

19    asked respondents to identify what they would have paid had

20    they known about an alleged issue with the Whirlpool

21    product; right?

22    **A**     Not quite.  So, the survey was designed to show

23    respondents different combinations of products attributes

24    for washing machines and some of those attributes were

25    additional maintenance because, for that case, it was

1  alleged that a defect in the product would have created mold

2  in the machine and, therefore, to get rid of that mold you

3  would have been required to do additional maintenance tasks.

4  **Q**     But it was a survey set up in a similar way to the

5  one you conducted in this case in that you used internet

6  respondents; right?

7  **A**     That was an internet survey as well, yes.

8  **Q**     And you presumably reached out to a company that

9  would provide those respondents based upon your criteria;

10  correct?

11  **A**     Yes.

12  **Q**     And then you conducted a series of questions similar

13  to, I mean, obviously the questions are different, but

14  similar manner, similar type method in which you did here;

15  correct?

16  **A**     No.  So, a conjoint survey is a very different type

17  of survey.  So I guess it depends on what you mean by

18  "similar type."  But --

19  **Q**     I just mean very generally.  You personally, as the

20  expert, created a list of questions.

21  **A**     Oh, yes.  I mean, I'm a survey expert, so I designed

22  the questionnaire, yes.

23  **Q**     I understand there's differences between a conjoint

24  survey and the one that you conducted here, the convenience

25  sample.  And I'm not trying to distinguish that.

1          My question is, that particular case was a

2    complaint that alleged a class of persons within Ohio;

3    correct?

4    **A**    It may have started as a nationwide class, I don't

5    recall.  But I know that the case ultimately was or the

6    court was ultimately in Ohio.

7    **Q**    And the class that the plaintiffs moved for class

8    certification on in that case were those people within Ohio,

9    correct, those residents within Ohio?

10   **A**    Again, that may be where it ultimately resolved, it

11   may have started as a nationwide class.  That, I don't

12   recall.

13   **Q**    But it's true in that case that you conducted an

14   internet survey of only those people within Ohio that met

15   your criteria; correct?

16   **A**    Again, I don't recall if we started with a nationwide

17   survey and then, as the case moved towards damages, we

18   focused only on Ohio.  I would have to go back and look.

19   **Q**    Ultimately, your report in that case and your

20   testimony as a result of that report was for an Ohio class

21   of persons and your internet survey respondents were limited

22   in geography to those in Ohio; correct?

23   **A**    I believe at the time that I did the survey that was

24   used for damages calculations, yes, the survey focused on

25   what I testified to in court or the actual trial was survey

1  based on Ohio residents.

2  **Q**    So it is possible to create a survey of people

3  limited by geography, such as by state; right?

4  **A**    Yes.

5  **Q**    And I know that at the time you issued your report

6  and gave your deposition your understanding was that there

7  was a nationwide class, you didn't understand that there was

8  an Alabama class, so my question to you is, it would have

9  been possible, had you known that there was an Alabama

10  class, to limit geography of your respondents to Alabama in

11  this case; right?

12  **A**    It would have been possible.  Again, my understanding

13  is there's not differences in the label at issue here by

14  Alabama relative to other states.

15       MR. BARTLETT:  With the exception, Ms. Butler, of

16  just trying to get that last little piece of information

17  maybe from your admin, we can get it before we conclude here

18  with Mr. Gresham.

19       Your Honor, that concludes my cross-examination of

20  Ms. Butler.  I would like to move to strike her based on her

21  methodology being flawed, rather than using the data in

22  possession of Walmart, which was verified purchasers of

23  these clean label shakes, the class members essentially, and

24  that she used a nationwide population of respondents versus

25  only those in Alabama.

1          THE COURT:  I certainly understand your criticisms

2    of her methodology, but I do not find that those criticisms

3    are any basis for concluding that she's not qualified as an

4    expert in surveying and statistical sampling, and so I will

5    overrule that objection.

6          MR. GRESHAM:  I don't have any further for her.

7    We are done with her.

8          THE COURT:  All right.  Then you can step down.

9    Thank you.

10          THE WITNESS:  Thank you.

11          THE COURT:  Let me ask you guys to give me a

12    general idea of how much longer you think we should go.  I'm

13    just contemplating whether to take a break for lunch or

14    power through.  I can tell you that the people seated to my

15    left would prefer the later --

16          MR. BARTLETT:  Let's do whatever they prefer.

17    It's fine by me.

18          MR. GRESHAM:  Whatever the court prefers, I can

19    power through or I can go get lunch, and I'll be happy doing

20    either.

21          THE COURT:  Even if you power through, we'll have

22    more from the other side, too.  So why don't we take forty-

23    five minutes and come back a little before two, and we'll

24    get done.  Thanks.

25                       (LUNCH RECESS)

1        THE COURT:  Mr. Gresham, before you get started,

2    let me make sure we're all on the same page.

3        Certainly I understand that you guys feel

4    differently about Ms. Butler's testimony.  But where am I

5    suppose to slot that into the class cert analysis?  Is there

6    a specific cause of action that requires -- I'm simplifying,

7    I know, by saying that she mainly testified to reliance.

8    Just help me where that fits in here.

9        MR. GRESHAM:  Sure.  That is exactly where I was

10   about to go on the predominance aspect of it.

11       So, in the predominance issue, there are really

12   sort of two things here.

13       So, the first is her testimony that thirty percent

14   of people first purchased the shake before -- first

15   purchased the shake before 2019.  So thirty point one

16   percent of those people.  So what that means is for

17   approximately thirty percent of the class you're going to

18   have to do the same exact inquiry about what they paid when

19   they first purchased it, when they first purchased it, what

20   they paid when they first purchased it, and then when they

21   subsequently purchased it, and what they paid for that

22   subsequent purchase.

23       Because if, like Ms. Morris, they purchased it

24   before for the same price as they purchased it after, they

25   don't have standing, even though they would be within the

1   class definition that they have set.

2          And the Supreme Court has been very clear and, in

3   fact, in that TransUnion case that I cited several times,

4   says that everything -- you can't certify a class and there

5   cannot be class members that don't have standing.

6          So that's sort of the first prong of it is it

7   shows that there are a substantial number of the purported

8   class that first purchased the nonclean label shakes.

9          Then the second sort of prong to that is, so, they

10  rely on the Carriuolo case for the proposition that reliance

11  is not required.  The problem they have there is that the

12  Carriuolo case was interpreting the Florida Uniform

13  Deceptive and Unfair Trade Practices Act, not the Alabama

14  Deceptive Trade Practices Act.

15         If you will pull up slide thirty-seven for me,

16  please.  Yep.  Thirty-seven.

17         This is from the Alabama Deceptive Trade Practices

18  Act, Alabama Code Section 8-19-10.  And you have seen this

19  and we've discussed it earlier in relation to the written

20  notice that's required.

21         But the section, if you go look at the entire

22  section, under the Private Right of Action section, so there

23  is a whole list of things.  And you will see that

24  highlighted -- you will see that highlighted text there,

25  reasonably describing the unfair or deceptive act or

1    practice relied upon and the injury suffered.  We have to

2    presume that the legislature knew what they were doing here

3    and "relied upon" certainly has a meaning in the context of

4    these sort of deceptive claims.

5          So I would submit to the court that reliance is a

6    necessary aspect of an Alabama Deceptive Trade Practices Act

7    claim according to the language of the statute.  So that

8    would differentiate the claim here from the Carriuolo claim

9    which was interpreting the Florida case which the Florida

10   court had determined did not require a reliance prong.

11         So, if you get to that, if you do have to, as we

12   submit that the statute says, if you have to have reliance,

13   then Ms. Butler's testimony as to why people purchased the

14   shakes becomes a relevant inquiry to the reliance analysis.

15   And based on that, we think that predominance cannot

16   proceed, certainly for the Alabama Deceptive Trade Practices

17   Act claims.

18         THE COURT:  What about the warranty claims?

19         MR. GRESHAM:  The warranty claims would suffer

20   from the first of the thirty point one percent, that first

21   sort of aspect of it is going to require mini-trials there.

22   I would actually request some -- if we were doing

23   supplemental briefing, to confirm this, I don't think the

24   warranty requires a reliance aspect.  I think it is a

25   straight forward analysis.  But at least on the Alabama

1    Deceptive Trade Practices Act claims, it certainly is a

2    reliance prong there.

3          Now, on the predominance question.  I have already

4    sort of told you one differentiation between the Carriuolo

5    case and here.  And plaintiffs rely almost exclusively, at

6    least in their argument here today, on that Carriuolo case.

7    And they're citing it for the proposition that -- there only

8    has to be one question.  Well, that's not really the

9    analysis, and I think the court, the Supreme Court is clear

10    that that is not the analysis, is there a single issue, it's

11    does that issue predominate.

12          So, in Carriuolo, what the court said is that,

13    "the central liability question was so clearly common to

14    each class member".  That is why -- it was so clearly

15    common.  Here, the question of liability is not so common to

16    each person.  It's going to -- before it gets to liability,

17    we're going to have to go through and say why every single

18    person who purchased the shake -- sorry -- when each single

19    person first purchased the shake, how much they paid, when

20    they subsequently did it, when they subsequently purchased

21    it and how much they paid subsequently.  And that is not

22    information that Walmart has.

23          Slide twenty-eight.  Walmart only has the ability

24    to identify customers when the customer has given us the

25    information about who they are connecting via a Walmart.com

1    account.

2         So, we do have a list of some fifty-four thousand

3    people that purchased pediatric shakes, we'll get to whether

4    you can say they are clean label or not, I'll submit you

5    can't, but we'll go to testimony on that later.  We have

6    that.  But even for that list of people there, we would

7    still have to go and for each person have a mini-trial, did

8    they purchase that with cash earlier, did they purchase that

9    with a credit card that is different from the one that is

10   connected to their Walmart.com account previously, did they

11   purchase it with a check, did they purchase it with a gift

12   card -- all of those sorts of things are what we -- we don't

13   have a list of people who purchased shakes prior to 2018, or

14   a complete list, because Walmart can't identify cash

15   transactions.  Walmart can't identify -- and so, we have

16   this list.  But that list alone does not answer the question

17   of did they purchase it first before 2018 or did they first

18   purchase it after 2018.

19        All of that is going to have to be answered in

20   order to determine whether that person had an injury-in-

21   fact.  That sets this apart from Carriuolo in which there

22   was no -- there was no somebody purchased it before the --

23   purchased it before the window sticker was there and then

24   purchased it again for the window sticker after.

25        So there, the answer to the question of was the

window sticker incorrect went to liability.  The answer then was, what is the amount of damages.

Here, we don't even have the existence of damages. We don't even have class-wide liability.

Slide twenty-seven.  Here, common questions of fact cannot predominate where there exists no reliable means of proving class-wide injury-in-fact.  When a case turns on individualized proof of injury, separate trials are in order.

Here, I would submit to the court that individualized proof of injury is required for each individual person in this class; therefore, separate trials are in order.

And also in Vega v. T-Mobile USA, the Eleventh Circuit said, "if common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class should not have a substantial effect on the substance or quantity of evidence offered".  Here, that's simply not the case.

Every single person -- every single person who is added to that adds another inquiry of when they first purchased it, how much they paid for that first purchase, when they subsequently purchased it, and what they paid for that purchase, as well as the reasons why they purchased it.

1    So each individual person drastically increases the amount

2    of evidence that is required.

3           Even under the Eleventh Circuit precedent here,

4    class cert -- the common issues do not predominate.

5           This sort of leads us to another question of --

6    that is our, sort of in summarizing predominance argument

7    here, there are two levels of it.  One, in order to get to

8    standing for each individual class members, that requires a

9    separate independent inquiry for each person.

10          And then second, at least for the individuals who

11   first or at least for the Alabama Deceptive Trade Practices

12   Act, the question of reliance comes into account.  And there

13   we heard Ms. Butler's testimony that seventy percent did not

14   first purchase it based on the claims at issue and

15   approximately sixty-five did not subsequently purchase it,

16   continue purchasing it for those two label claims, as a

17   result of those two label claims.  So that to me or, Your

18   Honor, to Walmart precludes the predominance issues here.

19          As the Supreme Court -- and unlike in Carriuolo,

20   these questions are not simply damages calculations.  These

21   are the existence of an injury.  We haven't even gotten to

22   calculating each individual person's damages.  This is just

23   whether they have an injury-in-fact.

24          And the Supreme Court has recognized in TransUnion

25   "every class member must have Article III standing in order

1    to recover individual damages".

2             "Article III does not give federal courts the

3    power to order relief to any uninjured plaintiff, class

4    action or not".

5             So the Supreme Court is very clear that that

6    standing inquiry is going to be necessary for every single

7    member of the class.  We can't just ignore whether they were

8    injured or not.  And given that there exists no reliable way

9    of establishing class-wide liability, separate trials are in

10   order here.

11            If you don't have any further questions on that, I

12   will move to our ascertainability argument here.

13            THE COURT:  Go ahead.

14            MR. GRESHAM:  So, plaintiff proposes a class for

15   all persons in Alabama who on or after February 1st, 2018

16   purchased a clean label shake.

17            Walmart has offered evidence that membership in

18   the class, in plaintiff's proposed class, is unascertainable

19   for a variety of reasons.

20            First, the evidence shows that Walmart is

21   incapable of identifying members of the plaintiff's proposed

22   class.

23            Slide twenty-eight.  While Walmart has a record of

24   the total sales of shakes in Alabama, as I showed the court,

25   it can only identify those purchasers who have given Walmart

1    the information about who they are via the Walmart.com

2    account.

3         Of that small subset of purchasers, Walmart does

4    not have the data to enable it to distinguish between sales

5    of the original shakes that do not contain the disputed

6    claims and the clean label shakes at issue here.

7         Now, you heard Mr. Bartlett say, make a big deal

8    about item numbers and that we can use those item numbers to

9    connect purchasers -- confirm whether a given purchase is a

10   clean label or a nonclean label shake.  And he implied that

11   Ms. Redford changed her testimony.

12        One, she didn't change her testimony.  And two, if

13   you will go to slide forty for me, Ms. Redford specifically

14   testified that you cannot use -- Walmart cannot use those

15   item numbers to determine whether a given sale was a clean

16   label shake or a nonclean label shake.

17        If you look up there at the top, and this is

18   actually Mr. Bartlett's -- Mr. Lynch, who is one of the

19   plaintiff's counsel here who is doing the questioning, I

20   understand, not in the spreadsheet, but I'm talking about

21   within Walmart's system, take the data in the spreadsheet

22   and compare it to the data in Walmart's system that is not

23   contained in this spreadsheet, that is contained somewhere

24   else within their system, we can identify when clean label

25   shakes were sold.

1          Ms. Redford:  Let me state it more clearly.  The

2    data that you have here is from our system.  It is an

3    accurate reflection of what's in our system.  Our system has

4    item numbers that are linked together.  No, Walmart is not

5    able to tell you based on item number whether the item sold

6    was a clean label formulation or a conventional formulation.

7          So, even though we have that fifty-four thousand

8    and change list of people who purchased a shake, Walmart

9    does not have the ability in its records to determine

10   whether a given purchase was a clean label or a nonclean

11   label.

12         And, the evidence shows, the testimony in this

13   shows that the shakes were on the shelf at the same time,

14   and that there is a twelve to eighteen month -- well,

15   first -- sorry.

16         Go to slide six.  Sorry.  Slide thirty-two.

17         The evidence shows Walmart was selling the

18   conventional shakes alongside the clean label shakes.

19         Go to slide thirty-eight.  The shakes have a shelf

20   life of between twelve and eighteen months.

21         Now, the record reflects that Ms. Morris first

22   purchased the shakes, and I believe it was December 2017,

23   and her last purchase, I believe, was in October of 2018.

24   So that twelve to eighteen month shelf life covered the

25   entirety of Ms. Morris' claim or her purchases and likely

1    that of numerous other people as well.

2           So, for Ms. Morris, we can't even say for certain
3    that she purchased a clean label shake, and that would be
4    the case for every single one of these people.  There is no
5    way for Walmart, and the evidence reflects that, to
6    determine from its records whether a given shake was sold as
7    a clean label or a nonclean label shake from the data in its
8    system.

9           THE COURT:  Let me ask you this before you move
10   on.  I'm glad you raised the issue about -- I think it was
11   more than implicit that your witness changed her testimony.
12   I don't have that witness in front of me.  And I have not
13   yet spent a significant amount of time reviewing that
14   testimony.  But if I were to be concerned about inconsistent
15   testimony, I would ordinarily make a credibility finding.
16   How am I suppose to do that today when you have elected not
17   to bring that witness?

18          MR. GRESHAM:  Well, Your Honor, I think first I
19   will say that, I think if you go back and look, what you
20   will see, there is a whole bunch of testimony about item
21   numbers and item numbers changing.  I don't think you will
22   see her say that you can say for certain -- and certainly
23   not in the testimony he cited so far has said that you can
24   say for certain, based on that item number in their records,
25   that a given sale was for a clean label or nonclean label

1   shake.

2          And in terms of making that credibility

3   determination, you're right, Your Honor, we did make the

4   decision not to bring them here.

5          So in terms of how the judge and how you are to

6   make a credibility determination, if you think that is

7   necessary, we can certainly put her up at another hearing or

8   if -- I mean, Your Honor would be allowed to -- you could

9   make the determination based if she changed her testimony

10  and she is not credible and that is within Your Honor's --

11  but I don't think the record will reflect that she changed

12  her testimony on that subject.

13          THE COURT:  All right.

14          MR. GRESHAM:  Now, in the argument here and in

15  their reply, the plaintiff disputes Walmart's reliance on

16  the Eleventh Circuit's case in Karhu and plaintiffs cite to

17  Rensel and others.

18          Even accepting the Rensel and the Cherry

19  determination here, the only thing they rejected in Karhu

20  was that it can't be ascertained in a convenient manner.

21          Here, in Rensel, they said, they made it clear

22  that the court should still ask "whether the membership is

23  capable of determination".

24          So the ascertainability requirement still stands.

25  It's still -- the court must still look at it and can we

1    determine this membership.

2           And here I would submit, Your Honor, they can't --

3    there is no record that would reflect -- and Walmart's --

4    that would reflect whether a given person purchased a clean

5    label shake or not.

6           THE COURT:  What about their argument that you

7    could rely on the class members or potential class members

8    to self identify and in some way substantiate that claim?

9           MR. GRESHAM:  Sure, Your Honor, and I was going to

10   hop to that next.  I think there are lots of problems with

11   that.

12          They cite to this Collins v. Quincy Bioscience

13   case for the proposition that you can rely on affidavits.

14   And I think certainly there are situations and certain cases

15   where affidavits would be appropriate and have been found by

16   courts to be appropriate.

17          In Collins they allowed it.  But if you read the

18   Collins opinion, it was only one of a twelve part plan for

19   ascertaining class membership.  Moreover, the court in

20   Quincy specifically noted that self identification will be

21   possible because every bottle of the product sold contained

22   the same challenged statements.  So every single bottle, I

23   think it was Prevagen that they sold, contained the same at

24   issue statement that was allegedly used there.

25          So all they had to remember was, I bought a bottle

of Prevagen.  Here, that's not the case.  Here, the previous

version of the pediatric shake sold -- that weren't

shipped -- anything prior to 2018 or February of 2018 we

know contained a different label than the clean label

shakes.  So just because they remembered I purchased a clean

label shake doesn't mean they are a member of this class.

Unlike in Quincy.

In fact, if you go to slide four.  I showed

Ms. Morris the old label in her deposition.  As we showed

earlier, this label clearly shows it's artificially flavored

and clearly does not contain the no synthetic colors,

flavors or sweeteners.

Go to slide thirty-three.  Ms. Morris, however,

incorrectly identified the old label as the label for the

clean label shakes.

MR. BARTLETT:  Your Honor, that is not what the

testimony says.  You can read it right there.

MR. GRESHAM:  And she misidentified this label,

even though it says it was artificially flavored and does

not claim to contain no synthetic colors, flavors, or

sweeteners.

Slide thirty-four.  If Ms. Morris is confused,

then it's certainly reasonable to believe that a substantial

number of other purchasers of these shakes would be confused

as to whether they purchased a clean label or a nonclean

1    label shake.

2         I think a more appropriate case -- a more

3    appropriate case to consider here is the Randolph v. J.M.

4    Smucker case and this is out of the Southern District of

5    Florida, and it rejected the use of affidavits to ascertain

6    the class in a similar situation where some versions of the

7    crisco, which was at issue, contained the allegedly false

8    claims but others did not.

9         And I have got a copy of the case if Your Honor

10   would like it.

11        THE COURT:  Sure.

12        MR. GRESHAM:  I would submit that is a more

13   applicable case, a case that is closer at hand here, because

14   what you're going to have to deal with is each of those

15   persons said, yes, I purchased a pediatric shake.  Well, we

16   don't know if they -- and it's not reliable -- even if we

17   said did you purchase a clean label shake, well, we're going

18   to have to define what that is, and we have already seen

19   that Ms. Morris was at least confused, you can take

20   different connotations about her testimony, because it at

21   least shows she was confused as to which label she was

22   looking at.

23        And I think that would make simply relying on

24   affidavits, I think Walmart would have to have the ability

25   to test the understanding of those affidavits, and to test

1    whether that person is a member.  Because if we're just

2    relying simply on their recollection of a label that is,

3    quite frankly, the changes are quite minor, there's just

4    no -- there is no reliable method for ascertaining who is a

5    member of this class and who is not.

6         Second, given that Walmart didn't ship the clean

7    label shakes until, at the earliest, late February of 2018,

8    at the very least plaintiff's definition is overbroad

9    because it includes people that would not have purchased the

10   shakes here.

11        So, Your Honor, we would propose that there is no

12   way, not just a convenient way, there is no reliable method

13   for ascertaining who are members of this class.  For

14   instance, even if you could show -- go down to the level of,

15   you know, what he proposed about looking at inventory levels

16   at various stores in Alabama, you still don't have a way to

17   connect who purchased which one from that shake to a given

18   member of the class.

19        THE COURT:  Right, but you could use the inventory

20   levels to figure out when you had cleared out the old stock

21   and had the new formulation only; right?

22        MR. GRESHAM:  Assuming that information exists.

23   And there is not a -- the issue with going through the stock

24   is we know what was -- so this gets back to the item number.

25   If you want to go back and look at Ms. -- and I would

1    encourage you to go look at Ms. Redford's testimony on this

2    issue.  So, what is shipped to the stores and what is

3    sold -- the inventory comes from what is sold out of those

4    stores, right?  And this gets back to the issue of, we can't

5    tell you whether it's a clean label or a nonclean label

6    based on that item number and based on that sale.  So

7    Walmart's inventory shows these are shipped there and then

8    shows these are sold out -- these shakes are sold from there

9    but it doesn't determine was that the clean label one that's

10    sitting on the shelf next to the nonclean label that's

11    sitting on the shelf.

12          THE COURT:  I understand that.  And I think I

13    understand exactly what you're saying on that.

14          Let me ask this separate question.  Have you guys

15    established through the discovery process that once you

16    started shipping the clean labels you did not ship any more

17    unclean labels?

18          MR. GRESHAM:  I don't know that that has been

19    conclusively established.  I don't know the answer to that.

20          THE COURT:  All right.  It strikes me that even if

21    you had concerns about it being overbroad, you could at

22    least use some data at the end of February as the beginning

23    of shipping date on the new ones.  And if you have

24    established that there are no more unclean labels shipped

25    after that date, then you use that as the start date for

1  eighteen months being the outside of the shelf life and then

2  you would conclusively be able to say that eighteen months

3  from, say, March 1st, just for convenience, would be the

4  date at which there could not be unclean label shelves on

5  the floor.

6      MR. GRESHAM:  I don't know that you could say

7  conclusively because, you know, as we have all seen, things

8  stay on the shelf beyond their shelf life sometimes.

9      But practically you're right, Your Honor.  The

10  issue here would come down to the fact that she would no

11  longer be an adequate plaintiff here because she would not

12  be in that because all of her purchases occurred within that

13  eighteen month span.

14      So that is all of my ascertainability argument

15  here.

16      There is one thing, and sort of a -- I wanted to

17  get back to the standing because I realized I forgot to sort

18  of cover one point with you.

19      If you will go to slide fourteen.  So we spent a

20  great deal of time here talking about the fact that

21  Ms. Morris purchased the shakes, the previous version, the

22  nonclean label shakes, for the same price every single time

23  as she paid for the clean label shakes every single time.

24      And when I specifically asked Ms. Morris the

25  question if there would be no damages, if that was the case,

1    she said correct, she testified to that twice.

2            If you'll go to slide fifteen.  You weren't

3    damaged, were you?

4            Answer:  No.

5            So we have the plaintiff's own testimony that she

6    did not suffer damages here.  Your Honor, I don't see how

7    she can have standing when she herself has, in her

8    deposition, testified that she lacks standing.

9            THE COURT:  I don't know that I would put any more

10   stock on her opinions about standing than I do her opinion

11   about damages.  I think that is a legal concept.

12           MR. GRESHAM:  Sure.  But she certainly understands

13   what she would have paid or what she wouldn't have paid

14   which gets to the damages here.

15           Thank you, Your Honor.

16           THE COURT:  Before you finish, let me make sure

17   that we are on the same page about a couple of things that I

18   don't see in your brief and certainly the representation has

19   been made that you don't oppose them.

20           Starting with 23(a), numerosity.  There is no

21   opposition there?

22           MR. GRESHAM:  No, Your Honor.

23           THE COURT:  And there's no opposition to

24   commonality, at least for 23(a) purposes, there is at least

25   a common question?

1          MR. GRESHAM:  Sure, there is a common question as

2     to the truth or falsity of it.

3          THE COURT:  Superiority, I have not heard any

4     argument on that.

5          MR. GRESHAM:  No, Your Honor.

6          THE COURT:  Is there anything else that you can

7     think of that you do not oppose?

8          MR. GRESHAM:  Not off the top of my head, Your

9     Honor.

10         THE COURT:  All right.  Just wanted to make sure

11    we were on the same page.

12         Mr. Bartlett.

13         MR. BARTLETT:  Thank you, Your Honor.  I'm going

14    to try to do this quickly.  And if it's okay with you, I may

15    go in reverse order from what Mr. Gresham just argued.

16         With respect to damages.  The testimony that

17    Ms. Morris gave that was just put on the screen by

18    Mr. Gresham's assistant over there was after about seven

19    questions of the same question in which Ms. Morris said yes,

20    I'm damaged and explaining exactly why.  That's in the

21    brief.  I don't think we need to go back over it.  There was

22    a form objection lodged and that form objection was

23    repetitive.  I mean, the same question had been asked until

24    he got the answer that he wanted.

25         With respect to ascertainability.  If I recall

right, Walmart put up a quote from Ms. Redford's deposition
at Page 228.  If I may just approach, Your Honor, and give
you -- I don't know that it's designated from them, this is
just a highlighted -- unnotated transcript.  I don't have
theirs.

Mr. Gresham is right that Ms. Redford did, in
responding to Mr. Lynch, which is a lawyer that represented
Ms. Morris and took this deposition, she did answer the same
question concerning whether you can determine from the item
number whether it was an unclean or clean label shake.

What Walmart didn't mention is that this was one
or two pages after Mr. Gresham had just asked that same
question.  So this is not a prior question.  This is
Mr. Lynch coming back and trying to clean up and understand
why she had changed her testimony.

If you look just a little bit above Page 228, I
think you'll see -- you will see Mr. Gresham saying --
sorry, on Page 227 -- Mr. Gresham saying, all right, no
further questions for me.  And then Mr. Lynch starts his
redirect on Line 8 of Page 227 which then gets into 228,
229.  So I just wanted to be clear that that was not
something that happened earlier in the deposition but was
after -- it was after that question from Mr. Gresham.

I heard quite a bit of argument that relying on
what a particular purchaser did or didn't do with respect

1   to -- did or didn't rely on with respect to label is

2   insufficient because their memory is just not good.

3        Well, Ms. Butler was just here testifying saying

4   that's perfectly fine, you can use recall, there is no issue

5   there.  So you can't -- if it's good enough for Ms. Butler

6   to say you can rely purely on recall to determine why

7   someone purchased these shakes, then I don't understand why

8   we can't rely on that for membership in the class.  You

9   can't have it both ways.

10       There was some comment, and I tried to find it,

11  I'm not sure I'm going to be able to, but there was

12  something put up on the screen about Ms. Morris and what she

13  testified about with respect to the actual label or the

14  picture of the bottle that she looked at.

15       Ms. Morris bought both the unclean and the clean

16  label.  There is no dispute there.  What she testified to,

17  if you read the language quite carefully, that was on the

18  bottle, it was on the bottle.  There is no dispute that

19  there was a bottle issued by Walmart, the unclean label, and

20  it was that bottle.  Just because she said it was on the

21  bottle doesn't mean that that is the one that she's suing

22  on.  That question wasn't asked.

23       With respect to inventory.  There's quite a lot of

24  deposition testimony, and it's in my excerpts that I

25  provided to you, about what is available to Walmart in terms

of data.  Ms. Redford testifies about it, another one of the corporate representatives testifies about it, and that is -- let me just do this.  I will just point you to kind of a couple pages.

Page 10, the bottom of Page 10 of my excerpts.  At the top, Ms. Redford, Page 90, Line 20, that first series of questions talks about inventory, what's on hand.  Also mentions that there are historical data available within Walmart system.

On my excerpts Page -- 37 of the excerpts, we've got Line 62, 1 through 15, testimony about inventory, what's available to Walmart, what it knows.  It's quite robust.

I think Your Honor had a question about dates and what Walmart knew in terms of when it started shipping clean label versus unclean label and when it made all these changes.

Ms. Redford testified to this, Page 13 of my excerpt, which is Page 148, Line 7 of her deposition.  One of the questions was, talks about the old item number and the new item number and the transition period.  Talks about a whole series of different events that occurred right around February, March of 2018.

Mr. Lynch then asked Ms. Redford:  Okay.  And so Walmart would have within its records the date that all of these -- that all of those events occurred.

1           Answer:  Yes.

2           THE COURT:  What is the cost change that's

3    referenced there?  My understanding is the cost to the

4    consumer never changed, it's a cost to Walmart?

5           MR. BARTLETT:  This is referencing the cost to

6    Walmart from Gehl Foods.  When it went from an unclean label

7    to a clean label the cost to Walmart increased.

8           There is, according to Ms. Redford, there is a

9    period in time in which the shake actually increased in

10   price to the consumer.  Didn't happen immediately, because

11   you'll see in the testimony of Ms. Redford, that there's a

12   process -- it kind of makes sense, if you think about it.

13   The cost has to come in to Walmart, they have to look at it

14   and they have to analyze the market and say, okay, we're

15   paying thirty cents more per product, we need to raise our

16   prices to the retail consumer as well.

17          While Ms. Redford doesn't testify exactly as to

18   what that date is, she says Walmart knows what that date is,

19   even though she didn't testify to it exactly.

20          I think now I'm onto predominance, Your Honor.

21   You heard the testimony of Ms. Butler, you heard the

22   cross-examination of Ms. Butler.  The key to me, to the

23   plaintiff here, is that there is no proof whatsoever that

24   these people that were interviewed for this survey and

25   responded to this survey to get paid purchased these shakes.

1          She even admitted today that she didn't know

2    whether these people that responded to her shake purchased

3    the unclean label shake or the clean label shake.  She

4    didn't have a single question that determined whether they

5    purchased that.  She just assumed, wrongly, that January 1

6    of 2018 was the date in which the clean label just

7    miraculously appeared on the shelf and the unclean label

8    disappeared.

9          We know from testimony that is not true.  That

10   didn't occur until late February.  So it's unreliable for at

11   least that reason.

12         It's also unreliable in that it doesn't encompass

13   the known purchasers of this product.  I mean, Walmart has

14   produced a list of fifty-two thousand some odd people that

15   purchased this clean label product.  It's not that

16   complicated to look at that and identify who those are.

17         Now, Walmart redacted the identifying information

18   pursuant to an agreement, and that's fine, but Walmart can

19   give that information to Ms. Butler.  She could have

20   conducted that survey that way.  It would have been a lot

21   more robust and we would have actually known what known

22   purchasers thought about these products.

23         Walmart made an argument concerning individual

24   analysis under predominance about those alleged purchasers

25   in Ms. Butler's survey that had purchased an unclean label

1    shake, at least according to her definition, something

2    before January 1, 2018.  And Walmart says that that is about

3    thirty percent of the respondents had purchased something

4    before January 1 of 2018.

5          That information is only relevant if you agree

6    with Walmart's injury argument that, first off, because

7    Ms. Morris and the class purchased a clean label shake that

8    had deceptive labels on it, they were not entitled to get

9    the money back from that purchase.

10          We cite a number of cases in our reply, four or

11   five, that talk about that type of damage being an

12   appropriate remedy.

13          You would also have to agree with Walmart's

14   analysis concerning the premium price paid.  We dispute that

15   Walmart's definition of market value is what Walmart set the

16   price of the unclean label at.  We haven't gotten that

17   discovery.  That's merits discovery.  We haven't gotten into

18   that.

19          What Walmart wants you to take as gospel is that

20   Walmart can set the market price.  Walmart doesn't set the

21   market price.  The market sets the price.  Just because I

22   put my used suit out on Ebay for five hundred dollars

23   doesn't mean that's the market price of a used suit.  It

24   just means that's what I want to sell it at.

25          We don't know why Walmart decided to add this

 1    clean label to the product and charge initially the same

 2    price.  Maybe it was because the unclean label wasn't

 3    selling.  Maybe the price was too high.  And so they

 4    improved the product by putting a clean label on it and sold

 5    it for the same price.

 6            Again, all questions that we don't know today, not

 7    relevant for the analysis here.

 8            One more point with respect to the ADTPA and

 9    reliance.  A code section, I think it was 8-19-10(e) was

10    placed on the screen.  That is the notice requirement part

11    of the provision.  That is where the word "reliance"

12    appears.  Doesn't appear anywhere else in the statute.

13            The relevant provision of the ADTPA which sets

14    forth the civil remedies available to an individual is

15    Section A, 1 through 3.  Reliance doesn't appear in there.

16            THE COURT:  While you are on that, did you want to

17    respond to their argument that they disclosed their assets

18    in the answer even though they did not in response to the

19    discovery request?

20            MR. BARTLETT:  I need to look at that, Your Honor.

21    I think that -- I don't dispute that they must have admitted

22    that.  That's the first time I have heard that argument.  I

23    need to pull that up.  I don't even remember which provision

24    that was.  I think that must have been under -- that was

25    probably under jurisdiction or venue.  I'm not sure that it

1  was relevant to the -- if you can give me just a second

2  after this, I can certainly look that up.

3           THE COURT:  Sure.

4           MR. BARTLETT:  I think the final thing I wanted to

5  talk about was standing.

6           You asked, when Mr. Gresham was up, if there was a

7  date known by Walmart about when the label, the unclean

8  label, was switched to the clean label and at what point in

9  time that happened.

10          Ms. Redford, we just talked about this, but

11  Ms. Redford testified to that on Page 13 of my excerpt, Line

12  1 -- I mean Page 148, Line 7 through about Line 10.  And

13  also Gifford which would be on Page 40 of my excerpt.  And

14  that's Page 38, Line 8.  Says, so if you look at this first

15  line in the email, "we are shipping the first cases

16  beginning this week."

17          Answer:  Yes.

18          Question:  Do you see that?  Do you have any

19  reason to doubt that those shakes began to ship that week to

20  stores?

21          Answer:  No.

22          Question:  Okay.  Do you know that they, in fact,

23  started shipping to stores?

24          Answer:  Based on this document, that's when they

25  say they were starting to ship to these stores.

1    So Walmart knows when they started shipping the

2    clean labels to the stores.

3    I already talked a little bit about the premium

4    price injury.  I don't think I will go back over that,

5    although that was certainly raised in standing.

6    The refund, whether it's called a refund or

7    whether it's -- whether it's damages of just purchasing it,

8    economic damages of purchasing it, doesn't matter.  The word

9    "refund" doesn't -- Mr. Gresham took some issue with my use

10   of the word "refund."

11   But if you look at plaintiff's reply at Pages 1

12   and 2, at the bottom, 1 and 2, we cite the Debernardis case,

13   we cite the Yachera case, we cite the Reynolds case, we cite

14   the Carter case.  All four of those cases talk about one

15   element of the damages Ms. Morris seeks; and that is, she

16   wouldn't have bought them had she known the contents didn't

17   match the label.  She wouldn't have purchased it otherwise.

18   And I think Mr. Hood has a couple of things on

19   injunctive, and I will look up the answer real quick, Your

20   Honor.

21   MR. HOOD:  I just have a case I need to give

22   you --

23   THE COURT:  Is that a real book?

24   MR. HOOD:  A reporter, give you a reporter cite.

25   I'm glad to be able to answer your question from earlier

this morning.

        The Davidson case that we cite from the Ninth
Circuit involved two state laws, California statutes, one
called the Consumer Legal Remedies Act and the other the
Unfair Competition Law.  Without doing a dip dive on those,
I'm saying those would approximate a Deceptive Trade
Practices Act that we have in Alabama, similar to the same
types of acts you have in other states.

        The decision Walmart cites from the Second
Circuit, which I put in kind of equipoise with our Davidson
case, is Berni, B-E-R-N-I, at 964 F.3d at 143 Note 1 and
146, the Second Circuit grudgingly acknowledged that the
language of Federal Rule 23(b)(2) only requires a single
circumstance for class relief to be granted prospectively.
A single circumstance dictated by the procedural rule for
relief under (b)(2) for an injunction.  And that is that the
party opposing the injunction has acted on grounds generally
applicable to the class so that final injunctive relief or
corresponding declaratory relief is appropriate respecting
the class as a whole.

        There is no question Walmart sold the same product
to all the same folks.  And more than that, they still do it
today, Your Honor.  That's how little they regard the
accusations and the evidence brought by our plaintiff.
That's how little regard they have for the duty of honesty

1  in their business practices.

2           That constitutes the single circumstance, even

3  their case says, is required -- is only required, I'm sorry,

4  let me make sure.  The only circumstance required to obtain

5  injunctive relief.  But under the proposition they have

6  given you, they have written that out of the law.  They are

7  asking this court to judicially repeal that provision of

8  Federal Rule 23(b)(2).  When a defendant like this commits a

9  deceit, a plaintiff comes forward to the court for redress.

10 Aware of that deceit, under their proposition, that

11 plaintiff never -- and I'll do it again, underscore never,

12 can end the wrong that caused their economic harm.  That

13 rights out the rule.  That rights out the state remedy under

14 the ADTPA which this court, as recently as seven years ago,

15 in American Income Life Insurance Company versus Google,

16 right here in this building, held that a private plaintiff

17 has an injunction available to them under the ADTPA.  That's

18 gone if you agree with them, in a case like this, a deceit

19 case.

20           So you need to be aware -- I would respectfully

21 submit the court should be aware that the proposition

22 presented by Walmart will change the law, not plaintiffs

23 changing it, they're changing it.

24           THE COURT:  What's the citation of that Google

25 case?  I don't think that was in your brief.

1          MR. HOOD:  Lexis 214 U.S. District Lexis, 124870.

2   Judge Blackburn.  Affirming an R&R from a magistrate judge.

3          Just in case I misspoke.  Houston is the Eleventh

4   Circuit case I attempted to distinguish in front of the

5   court.  I may have called it Holland at one point.  I hope I

6   didn't.  But Houston is the case that both sides addressed

7   which is the ADA claim or ADA case in which the only relief

8   available is an injunction.

9          With that, Your Honor, unless you have questions.

10          THE COURT:  No, thank you.

11          MR. BARTLETT:  I have the answer for Your Honor

12   about the answer.  We do not agree that the answer puts us

13   on notice.  That's Paragraph 7 of the complaint.  It's a

14   long paragraph.

15          The response is, from Walmart, admit that the

16   court has personal jurisdiction over Walmart as it relates

17   to the Kaylan Morris claims.  Denies that the court has

18   personal jurisdiction over Walmart for any claims by

19   out-of-state members of the proposed classes.

20          So a limited response or limited admission does

21   not admit the entire paragraph of the complaint.

22          THE COURT:  All right.  Not an exercise in the

23   last word, but if there is something in particular you want

24   to raise.

25          MR. GRESHAM:  Sure, Your Honor.  First, I would

just like to touch on that.  As you will see, it's admit that the court has personal jurisdiction over Walmart as it relates to Ms. Morris' claims, and it only denied it as to out-of-state claims.  So it's admitting that it has all those contacts within the State of Alabama.  It's just saying that those contacts don't apply to out-of-state purchasers.  With all due respect, I would say that has been admitted.

The only thing I would sort of point to is, they keep saying that the market has got to set the price.  You can't say Walmart set the price, Walmart set the price.  It doesn't say what the market price is.

The fact remains that Ms. Morris purchased it at that price, which I would submit, at least for her, sets what that market price is.  If she thought that price was too high, she certainly had the ability not to purchase it. But she purchased those shakes without the clean label.

So, Your Honor, she set the market price.  And they cite to cases bought it when they otherwise -- one of the cases they cite to on Page 2, and they emphasize this, Reynolds v. Walmart, Inc., they say or bought it when they otherwise would not have done so.

Here, she clearly would have bought it regardless of what the label said as it relates to naturally flavored and no synthetic colors, flavors and sweeteners.

1          THE COURT:  I thought I just saw testimony where

2     she said she would not have bought those shakes if she had

3     known the label was not accurate.

4          MR. GRESHAM:  Your Honor, she was confirming the

5     allegations in the complaint.  So if you read through that,

6     we're going through the allegations in the complaint.

7          So, what I would submit to you, Your Honor, is

8     that at that point she did not know that she had previously

9     purchased -- and if you go back to her deposition, you will

10    see this -- she did not know that she had previously

11    purchased nonclean label shakes.  Until her deposition, she

12    did not know.  So that's the first time she's seeing it.  We

13    walked through the complaint to confirm what she is

14    alleging.  And then once we go through and actually get her

15    testimony, she testifies to the fact that, oh, you're right,

16    if that was the case, if there were non -- if my first

17    purchases were nonclean label shakes, then I would not have

18    been damaged.

19         Now, I understand that damages is a legal

20    infrastructure, but she testified to it before, and she's

21    relying -- they can't have their cake and eat it too here.

22    So when faced with the true facts here, she admitted that

23    she didn't suffer any harm.  She admitted that she didn't

24    pay that premium price.

25         So, they can allege that she wouldn't have

1  purchased it otherwise, but here you're required to do a

2  rigorous analysis and look behind the pleading, even if

3  sometimes that touches on the merits.

4         The Supreme Court is very clear on that in the

5  Walmart case.

6         So here, we're looking behind the pleadings, we're

7  looking beyond her unsubstantiated allegations that she

8  wouldn't have purchased it and her actions here speak louder

9  than words.  She did, in fact, purchase it, indisputably,

10  without those labels and, indisputably, paid the same price

11  every single time.

12         THE COURT:  When did the price change?  To the

13  best of your knowledge.

14         MR. GRESHAM:  The only testimony we have on it is

15  in 2019, but we don't know the exact date.  I believe it was

16  in Ms. Gifford's deposition, there was testimony that there

17  was a price change in 2019 which again would have been after

18  Ms. Morris stopped purchasing the shakes.

19         Then finally on 23(b)(2).  It's not our rule.

20  It's the Supreme Court's rule.  The Supreme Court is clear

21  that they have to -- the named plaintiffs must have standing

22  before a class can be certified.

23         It's also clear from both the Eleventh Circuit

24  precedent and the Supreme Court precedent that in order to

25  get prospective relief there must be some threat of future

harm.  And the Southern District of Florida in the Wasser
case correctly found, as did the Second Circuit, and as did,
if you'll look at, I think it's Footnote 5 of the Ninth
Circuit's case, so did the other circuits that have looked
at this issue find that you can't certify a class based on
prospective relief when someone already knows of that
deception.

So she goes and purchases it again, she's not at
risk of being deceived again, she cannot possibly be
deceived again.  She knows or at least allegedly knows that
the label claims were false, Walmart disputes that
vigorously, but she's aware of it.  So any future harm, as
Wasser said, is self-inflicted and that is not -- and as for
differentiating between ADA only giving prospective relief,
to me that's even worse, you're saying that they can't get
any relief under the ADA because they don't have a threat of
harm.

Here, under the Deceptive Trade Practices Act,
they still have a damages section.  They're just saying
under Article III, if you have already purchased it, you
can't then get prospective relief.

THE COURT:  Help me, coming back to something you
said at the very beginning today.  You mentioned that you
could think of deceptive representations that would carry a
threat of future harm, but you agreed that in a consumer

1    context it's not likely.

2         Help me even conceptualize a representation that

3    would be a violation of the Alabama Deceptive Trade

4    Practices Act that would also carry a threat of future harm

5    such that you could certify a 23(b)(2) class.

6         MR. GRESHAM:  I think I said that under the

7    Alabama Deceptive Trade Practices Act there would be claims

8    in which you can both recover under that and under the

9    23(b)(2) and get an injunctive relief.  For instance, take

10   Alabama Power or some cable or the water, the waterworks,

11   whatever that is, you have an ongoing relationship where you

12   don't have a choice but to go away from Alabama Power or the

13   waterworks.  If they have some deceptive trade practice, you

14   can't choose to stop it or your electricity is shut off or

15   your water gets shut off.

16        In those cases there would be situations where you

17   could both get damages and something making them stop.

18        Here, they stop purchasing, they can purchase

19   someone else's, similar shakes, they can just not get shakes

20   altogether.  It's not the same thing.

21        I will say that in the TransUnion case, he's

22   right, the Alabama Legislature does say that you can get

23   injunctive relief on these claims.  If they want to go to

24   state court and do that, they can certainly do that.

25        Federal court, TransUnion, has said, the Supreme

1   Court said just last year that even Congress cannot create

2   standing by giving a statutory penalty in the class context.

3   And I would submit if Congress can't do it, if Congress

4   can't overcome Article III's standing requirements, then the

5   Alabama Legislature cannot either.

6           THE COURT:  All right.

7           MR. GRESHAM:  That's all I have, Your Honor.

8           THE COURT:  Okay.  Circling back to my question at

9   the beginning, does anybody feel like they need supplemental

10  briefing?

11          MR. GRESHAM:  No, Your Honor.  I may want to look

12  at that issue on the, as I mentioned, Your Honor, on the --

13  whether reliance is required under the breach of warranty.

14  I don't think it is.  But I can discover that pretty quick.

15  If there is, I would like to submit a brief on that.  That's

16  the only thing.

17          MR. HOOD:  From the plaintiff's perspective, no

18  additional briefing is needed, Your Honor.  But if defense

19  asks for leave and submits something, I would expect we

20  would want to reply.

21          THE COURT:  The main reason why I ask is if we're

22  going to want a formal transcript prepared, we need to go

23  ahead and ask for it today.

24          MR. BARTLETT:  Your Honor, we looked at the --

25  Mr. Gresham is certainly welcome to do his analysis, we

1   looked at the reliance issue under the warranty, and it's

2   not required.  Again, if he wants to do that --

3           MR. GRESHAM:  I think that's correct.  Before I

4   say for certain, I just want to make sure.  And I'm

5   certainly willing to do that and get an email to chambers or

6   however the court would want, within the next two days, I

7   can do it by the end of the week, whether we would like to

8   submit an additional brief.  It wouldn't be long.  I think

9   it would be on the order of a page or two, if we did.

10          MR. BARTLETT:  I guess what you're trying to

11  figure out whether she needs to prepare a transcript.  Do

12  you plan on getting the transcript?

13          MR. GRESHAM:  I usually do.  One housekeeping,

14  matter, Your Honor.  These are just the designations, I

15  would like to submit these just so that the designations --

16  I don't have them, unfortunately, nice and neat like he

17  does, but all the transcripts, they have already been filed.

18  But I just wanted to make sure on the record it shows the

19  deposition designations.

20          THE COURT:  I think it's already in our docket.

21          MR. GRESHAM:  I just didn't want to get stuck in a

22  position where they're going to say I can't rely on it on

23  appeal --

24          THE COURT:  I don't think we need it separately

25  filed today.

1          MR. HOOD:  I don't want to burden or not burden or

2   confuse, we will request a transcript today and the

3   plaintiff will be responsible for the cost.

4          THE COURT:  I just wanted to make that clear while

5   we were here.

6          Anything else?

7          MR. GRESHAM:  Nothing from our perspective, Your

8   Honor.

9          THE COURT:  We're adjourned.

10                     (COURT ADJOURNED)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


    I hereby certify that the foregoing is a correct transcript from the record of the proceedings in the above-referenced matter.


_____

Teresa Roberson, RPR, RMR